479 S.E.2d 838

**The STATE, Respondent,**

v.

**Robert A. KENNEDY, Appellant.**

**No. 2595.**

Court of Appeals of South Carolina.

Heard Nov. 7, 1996.

Decided Nov. 25, 1996.

Rehearing Denied Jan. 24, 1997.

Tara Dawn Shurling; Oliver W. Johnson, III; and South Carolina Office of Appellate Defense, Columbia, for Appellant.

Attorney General Charles Molony Condon, Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Salley W. Elliott, and Solicitor Warren B. Giese, Columbia, for Respondent.

ANDERSON, Judge:

Robert A. Kennedy (Kennedy) was charged with first degree burglary and second degree arson in connection with the burning of Nancy Powell's residence. At trial, Kennedy moved to suppress statements he made to police officers subsequent to his arrest. After holding a *Jackson v. Denno* [1] hearing, the trial court denied the motion. Although Kennedy was acquitted of first degree burglary, the jury found him guilty of second degree arson. Kennedy appeals. We affirm.

## FACTS/PROCEDURAL BACKGROUND

On November 7, 1992, at approximately 7:15 p.m., C. Ray Miles noticed fresh tire tracks in the woods near some property he owned in Kershaw County. Miles thought poachers might be on his property so he called the Sheriff's Department. Kirk Corley, a county constable, and Charles B. Thompson, Jr., a conservation officer, were dispatched.

The three individuals found a blue truck with a Kansas license plate parked in a secluded spot in the woods. As they attempted to locate the owner, Robert Kennedy ran out of the woods from the driveway of a home owned by Nancy Powell. When questioned as to his reason for parking his truck on private property, Kennedy nervously explained he was looking for a dog he hit with his truck. He then changed his story and said he had driven there to meet a woman. He said he parked the truck as he did to prevent it from being vandalized. Kennedy produced identification and informed the men he was

---

1. 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964).

stationed at Fort Jackson. After Kennedy left, the three men investigated the area and found the Powell house fully engulfed in flames. SLED Agent Charles Huggins, a member of the arson team, conducted a fire cause and origin investigation and opined the fire was intentionally set.

Kennedy was later arrested and charged with first degree burglary and second degree arson. At Kennedy's trial, an *in camera* hearing was held pursuant to *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), to determine the admissibility of statements made by Kennedy.

### Jackson v. Denno Hearing

Witnesses for the State were: Steven Vincent, Charles Huggins, David Thomley, and Jerry Horton. Additionally, Kennedy testified at the hearing.

## EVIDENCE OF THE STATE

### (Vincent, Huggins & Thomley)

Steven Vincent, an investigator with the Kershaw County Sheriff's Department on November 7, 1992, responded to the scene of the fire and received information regarding Kennedy. That same evening, Vincent, accompanied by Investigator David Thomley, drove to Fort Jackson and attempted to locate Kennedy. However, he was off base on a four day leave.

On the following Monday, Vincent, SLED Agent Charles Huggins, and Investigator David Thomley returned to Fort Jackson with two warrants for criminal trespass. The officers arrested Kennedy and Vincent advised him of his *Miranda* rights.

At that time, Kennedy said, "I do not understand, sir." When Vincent asked him what he did not understand, Kennedy stated he did not understand why the officers wanted to talk to him. Vincent explained to Kennedy he wanted to speak to him about another crime that occurred the night of the trespass. Kennedy responded "he just did not understand." While being questioned, Kennedy stated, "I don't have anything to say." Vincent made no threats, promises, or offers of leniency to Kennedy.

Thomley drove Kennedy to the Kershaw County Sheriff's Department from Fort Jackson. During the trip, Thomley and Kennedy engaged in "small talk." Thomley denied, however, the two discussed Kennedy's criminal charges. Upon arrival at the Sheriff's office, Thomley took Kennedy to his office. After removing Kennedy's handcuffs, the two men engaged in more "small talk."

Thomley asked Kennedy whether he understood his rights and the charges against him. Kennedy told Thomley he understood his rights, but was unclear about the criminal trespassing charges. Thereafter, Thomley explained the trespassing charges. Thomley then asked Kennedy if he understood why arson was being investigated and Kennedy indicated he did not understand. Thomley explained the statutes regarding arson and burglary as well as the matters which implicated Kennedy regarding those charges and the penalties attached to each. Thomley further explained the court had discretion concerning whether to sentence a defendant to probation or the maximum penalty. He indicated to Kennedy that officers had little control over recommendations, which were essentially matters within the solicitor's control. Kennedy asked to speak to the solicitor. Thomley permitted Kennedy to make several phone calls while in his office.

Around 8:00 that night, Vincent spoke with Thomley and learned Kennedy was in Thomley's office, but had nothing to say about the offenses. Thomley informed Vincent that Kennedy "wants to talk to the solicitor." Vincent contacted Assistant Solicitor Glenn Rogers, who stated he would talk with Kennedy the next morning.

The next day Vincent, along with Huggins, Thomley, and Rogers, spoke to Kennedy in a large room used as the Sheriff's business office. Huggins advised Kennedy of his rights and Kennedy indicated his understanding. He executed a written waiver of his rights and did not appear to be under the influence of drugs, alcohol, or mental infirmity.

Kennedy wanted to talk with Thomley and Rogers alone, so Vincent and Huggins left the room. Rogers then asked Kennedy what he wanted to talk to him about. Kennedy inquired, "What if I ask for an attorney?" Solicitor Rogers immediately left the room. Thomley responded, "If you want

an attorney, okay. But Solicitor Rogers is not going to talk to you this morning." However, Kennedy did not ask to speak to an attorney. Kennedy specifically stated, "No, call [Solicitor Rogers] back in here. Let's go ahead and get this over with."

Upon Rogers' return, Kennedy stated, "Okay, I did it." He claimed he entered the Powell residence through the back door. Thomley indicated Kennedy did not ask for food or state he was hungry, tired, or thirsty at the time he gave his statement. Further, Thomley never advised Kennedy he would not get a deal if he did not talk.

Within fifteen to thirty minutes, Vincent and Huggins reentered the room at Thomley's request. Huggins again advised Kennedy of his rights and Kennedy indicated he understood his rights. At that time, Kennedy gave a statement in which he admitted setting the fire. Vincent took notes during the statement and Huggins wrote the statement at Kennedy's request.

Huggins essentially corroborated the testimony of Vincent and denied Kennedy stated, "I think I need a lawyer." Thomley's testimony replicates substantial portions of the testimony of both Vincent and Huggins.

### ROBERT ALAN MARTIN KENNEDY

On the day of his arrest, prior to meeting with Huggins, Thomley, and Vincent, Kennedy consulted a lawyer at Fort Jackson who advised him to invoke his right to remain silent. Vincent read the criminal trespass warrants and advised Kennedy of his rights. When Vincent asked whether he understood his rights, Kennedy asserted, "I ain't got nothing to say." He admitted he understood his *Miranda* rights, but did not understand the discussion concerning countersigning the warrants.

Upon arriving at the Kershaw County Detention Center, Kennedy was taken to Thomley's office. Kennedy testified Thomley expressed to him the seriousness of burglary and arson charges and read the sentence for each. Kennedy told Thomley, "I ain't got nothing to say," and asked to make several phone calls, which he was permitted to do.

When Thomley arrived at the detention center the next morning, he indicated to Kennedy the Solicitor was willing to speak with him. At that time, Kennedy told Thomley, "[l]ook, I did it."

At the Sheriff's office, Huggins advised Kennedy of his rights. Kennedy testified that in response to Huggins stating they were not offering Kennedy a deal, he then said, "Well, I think I need a lawyer." He stated Solicitor Rogers then left the room, but Huggins remained. Although he admitted he signed the waiver of rights form once, Kennedy claimed he refused to sign it a second time.

While alone in the room with Kennedy, Thomley said, "Look, everything we talked about, the only way we can help you out, that's the guy you need to talk to." When Kennedy asked him about an attorney, Thomley responded he would have to wait until one was assigned to his case. Kennedy admitted that when he asked how to obtain a lawyer, he was advised by Thomley he could either hire one or receive a public defender after a financial check to determine Kennedy's indigency status. Kennedy understood an attorney would not be appointed immediately and that he would have to wait until one could be appointed.

Upon questioning by the court, Kennedy admitted he decided to talk to officers rather than waiting for appointment of counsel. He stated Thomley advised him the only way he would be released from jail would be through a bail hearing.

Kennedy identified his signatures and initials on each page of his statement. He claimed that at the time he provided his statement he was tired, hungry, depressed, and frustrated. On cross examination, he admitted he never asked to use the telephone book to locate an attorney to represent him and did not again try to contact the J.A.G. officer he had consulted earlier.

The jury acquitted Kennedy of the first degree burglary charge, but found him guilty of second degree arson.

## ISSUES

I.   Did the trial court err in denying Kennedy's motion to suppress statements made by him to the police?

II. Was the trial court's malice instruction erroneous?

III. Did the trial court err by considering improper factors in determining the appropriate sentence?

## STANDARD OF PROOF

In *State v. Washington*, 296 S.C. 54, 370 S.E.2d 611 (1988), our Supreme Court annunciated the standard of proof applicable in a *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), hearing to determine admissibility of a statement:

"It has been uniformly held, a confession may be introduced upon proof of its voluntariness *by a preponderance of the evidence.*" *State v. Smith*, 268 S.C. 349, 354, 234 S.E.2d 19, 21 (1977) (Emphasis supplied).

"[T]he burden is on the State to prove *by a preponderance of the evidence* that his rights were voluntarily waived." *State v. Neeley*, 271 S.C. 33, 40, 244 S.E.2d 522, 526 (1978) (Emphasis supplied).

"[T]he prosecution must prove ... *by a preponderance of the evidence* that the confession was voluntary." *Lego v. Twomey*, 404 U.S. 477, 489, 92 S.Ct. 619, 627, 30 L.Ed.2d 618, 627 (1972) (Emphasis supplied).

. . . .

Where voluntariness of a statement is at issue the trial judge must make an initial determination based upon the preponderance standard. If the statement is found to have been given voluntarily, it is then submitted to the jury, where its voluntariness must be established beyond a reasonable doubt.

*Washington*, 296 S.C. at 55–56, 370 S.E.2d at 612 (emphasis in original).

## LAW/ANALYSIS

### THE MIRANDA RULE

A statement, whether exculpatory or inculpatory, obtained as a result of custodial interrogation is inadmissible unless the person was advised of and voluntarily waived his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The purpose of *Miranda* is to prevent "govern-

ment officials from using the coercive nature of confinement to extract confessions that would not be given in an unrestrained environment." *Arizona v. Mauro,* 481 U.S. 520, 529–30, 107 S.Ct. 1931, 1937, 95 L.Ed.2d 458 (1987).

### Miranda Warnings

A suspect in custody may not be subjected to interrogation unless he is informed that: he has the right to remain silent; anything he says can be used against him in a court of law; he has a right to the presence of an attorney; if he cannot afford an attorney, one will be appointed for him prior to any questioning, if he so desires; and he has the right to terminate the interrogation at any time and not to answer any further questions. *Miranda, supra.*

It is sufficient if the warnings reasonably convey to a suspect his rights as required by *Miranda. Duckworth v. Eagan,* 492 U.S. 195, 109 S.Ct. 2875, 106 L.Ed.2d 166 (1989). A "talismanic incantation" is not required. *State v. Singleton,* 284 S.C. 388, 326 S.E.2d 153, *cert. denied,* 471 U.S. 1111, 105 S.Ct. 2346, 85 L.Ed.2d 863 (1985), *overruled in regard to the doctrine of in favorem vitae by State v. Torrence,* 305 S.C. 45, 406 S.E.2d 315 (1991) (omission of phrase "in court" did not render warning inadequate).

## CUSTODY REQUIREMENT

*Miranda* warnings are required for official interrogations only when a suspect "has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda,* 384 U.S. at 444, 86 S.Ct. at 1612.

## INTERROGATION REQUIREMENT

■ The special procedural safeguards outlined in *Miranda* are not required if a suspect is simply taken into custody, but only if a suspect in custody is subjected to interrogation. Interrogation is either express questioning or its functional equivalent. It includes words or actions on the part of police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response. *Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). *See also State v. Franklin,* 299 S.C. 133, 382 S.E.2d 911 (1989).

## SIXTH AMENDMENT RIGHT TO COUNSEL

Academically, it is important to recognize the distinction between Sixth Amendment right to counsel and Fifth Amendment right to speak to counsel. In *State v. Register*, 323 S.C. 471, 476 S.E.2d 153 (1996), our Supreme Court explicated:

> The Sixth Amendment right to counsel attaches when adversarial judicial proceedings have been initiated and at all critical stages. *Compare Brewer v. Williams*, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977) *with Michigan v. Jackson*, 475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986). Hence, the right to counsel in judicial proceedings is distinguished from the Fifth Amendment *Miranda—Edwards* right to speak with counsel upon request in a *custodial* setting. *McNeil v. Wisconsin*, 501 U.S. 171, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991); *State v. Wilder*, 306 S.C. 535, 413 S.E.2d 323 (1991). The Sixth Amendment right does not attach simply because the defendant has been arrested or because the investigation has focused on him. *Hoffa v. United States*, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966). Further, the Sixth Amendment right attaches only "post-indictment", at least in the questioning/statement setting. *See Michigan v. Harvey*, 494 U.S. 344, 110 S.Ct. 1176, 108 L.Ed.2d 293 (1990).

*Register*, 323 S.C. at 477, 476 S.E.2d at 157.

## VOLUNTARINESS OF STATEMENT

In *State v. Franklin*, 299 S.C. 133, 382 S.E.2d 911 (1989), our Supreme Court discussed the voluntariness requirement:

> The test of admissibility of a statement is voluntariness. If a defendant was advised of his *Miranda* rights, but nevertheless chose to make a statement, the "burden is on the State to prove by a *preponderance of the evidence* that his rights were voluntarily waived." *State v. Washington*, 296 S.C. 54, 370 S.E.2d 611 (1988) (emphasis in original); *State v. Neeley*, 271 S.C. 33, 244 S.E.2d 522 (1978). The State bears this burden of proof even where a defendant has signed a waiver of rights form.... The trial judge's determination of the voluntariness of a statement must be made on the basis of the totality of the circumstances, including the background, experience and conduct of the accused.

*State v. Linnen,* 278 S.C. 175, 293 S.E.2d 851 (1982). The trial judge's resolution of the issue will not be disturbed absent an error of law. *State v. Atchison,* 268 S.C. 588, 235 S.E.2d 294, *cert. denied,* 434 U.S. 894, 98 S.Ct. 273, 54 L.Ed.2d 181 (1977).

*Franklin,* 299 S.C. at 137–38, 382 S.E.2d at 913–14.

Once *Miranda* rights are validly and voluntarily waived, the waiver continues until such time as the individual being questioned revokes the waiver or circumstances are such that his will is overborne and his capacity for self-determination is critically impaired. *State v. Moultrie,* 273 S.C. 60, 254 S.E.2d 294 (1979). If his will is overborne and his capacity for self-determination critically impaired, use of the resulting confession offends due process. *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). In determining whether an individual's will was overborne, "the Court has assessed the totality of all the surrounding circumstances— both the characteristics of the accused and the details of the interrogation." *Id.* at 226, 93 S.Ct. at 2047. Important factors for consideration include the individual's education, youth, low intelligence, receipt of *Miranda* warnings, repeated and prolonged nature of the questioning, and physical abuse. *Schneckloth, supra.*

The trial court's "determination of the voluntariness of a statement will not be disturbed unless so manifestly erroneous as to show an abuse of discretion amounting to an error of law." *State v. McLeod,* 303 S.C. 420, 423, 401 S.E.2d 175, 177 (1991), *overruled on other grounds by State v. Evans,* 307 S.C. 477, 415 S.E.2d 816 (1992). "The test for determining the admissibility of a statement is whether it was knowingly, intelligently, and voluntarily given under the totality of the circumstances." *State v. Peake,* 291 S.C. 138, 139, 352 S.E.2d 487, 488 (1987). *See also State v. Rochester,* 301 S.C. 196, 391 S.E.2d 244 (1990) (trial judge's determination of whether statement was knowingly, intelligently and voluntarily made requires examination of totality of circumstances surrounding waiver). "A statement induced by a promise of leniency is involuntary only if so connected with the inducement as to be a consequence of the promise." *Peake,* 291 S.C. at 139, 352 S.E.2d at 488.

In *State v. Doby,* 273 S.C. 704, 258 S.E.2d 896 (1979), our Supreme Court addressed the voluntariness requirement of a *waiver of rights:*

> The signing of the waiver form alone is not conclusive; the State still has the burden of showing the waiver was voluntary. This requires an examination of the totality of the circumstances surrounding the waiver, including the background, experience, and conduct of the accused. (citations omitted).

*Doby,* 273 S.C. at 708, 258 S.E.2d at 899.

### DISCUSSION

On appeal, Kennedy argues his statements were taken in violation of his right against self-incrimination under the Fifth and Fourteenth Amendments to the United States Constitution, as well as Article I, § 12 of the South Carolina Constitution. Additionally, Kennedy asserts the statements were in violation of his right to counsel as protected by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, as well as Article I, § 12 of the South Carolina Constitution.

The evidence in this case establishes Kennedy was over thirty years old; had graduated from high school and attended a semester and a half of college; had been in the military for over ten years; attended additional educational courses while in the military, such as a leadership development course and the United States Army Drill Sergeant School; was a drill sergeant in the military; was not a man of limited mental or physical ability or experience; and had been trained by the military in interrogation tactics and permissible responses. He was articulate and able to read and write. Kennedy communicated well with the law enforcement officers, who all testified Kennedy appeared to understand the questions asked of him. In addition, Vincent, Thomley, and Huggins all testified no promises or threats were made to Kennedy. They further testified Kennedy was not under the influence of alcohol or drugs. Prior to his arrest, Kennedy consulted a J.A.G. attorney, who advised Kennedy to immediately invoke his right to remain silent upon questioning. He was advised

of his *Miranda* rights upon arrest and at least two times thereafter.

Although Kennedy stated he did not understand *why* the officers wanted to talk to him, he never indicated he did not understand his *Miranda rights.* When Kennedy said he had nothing to say, questioning ceased and Thomley drove Kennedy to Kershaw County.

Kennedy was allowed at least thirteen long distance phone calls to numerous family members prior to giving his statement. These family members advised Kennedy not to say anything to the officers. Kennedy did not attempt to contact the J.A.G. lawyer or any other attorney during this period of time. He also did not request assistance in contacting an attorney. While in Thomley's office, Kennedy said he did not understand the charges against him; however, he specifically testified he understood his rights.

When Thomley arrived at the jail the morning after Kennedy's arrest, Kennedy *voluntarily* stated, "I did it." This oral admission was not in response to any interrogation by Thomley, but was voluntary on Kennedy's part. *See Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). Volunteered statements of any kind are not barred by the Fifth Amendment. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

In *Michigan v. Mosley,* 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975), the United States Supreme Court amplified:

> [A] blanket prohibition against the taking of voluntary statements or a permanent immunity from further interrogation, regardless of the circumstances, would transform the *Miranda* safeguards into wholly irrational obstacles to legitimate police investigative activity, and deprive suspects of an opportunity to make informed and intelligent assessments of their interests. Clearly, therefore, neither this passage nor any other passage in the *Miranda* opinion can sensibly be read to create a *per se* proscription of indefinite duration upon any further questioning by any police officer on any subject, once the person in custody has indicated a desire to remain silent. (footnote omitted).

A reasonable and faithful interpretation of the *Miranda* opinion must rest on the intention of the Court in that case to adopt "fully effective means ... to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored...." The critical safeguard identified in the passage at issue is a person's "right to cut off questioning." Through the exercise of his option to terminate questioning he can control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation. The requirement that law enforcement authorities must respect a person's exercise of that option counteracts the coercive pressures of the custodial setting. We therefore conclude that the admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his "right to cut off questioning" was "scrupulously honored." (citations omitted).

*Mosley*, 423 U.S. at 102–04, 96 S.Ct. at 326.

If an accused requests counsel after receiving *Miranda* warnings, he should not be subjected to further interrogation outside counsel's presence unless the accused initiates further communication with law enforcement officers. *Smith v. Illinois*, 469 U.S. 91, 105 S.Ct. 490, 83 L.Ed.2d 488 (1984). In *Davis v. United States*, 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994), the Court instructed:

Rather, the suspect must unambiguously request counsel. As we have observed, "a statement either is such an assertion of the right to counsel or it is not." *Smith v. Illinois*, 469 U.S. at 97–98, 105 S.Ct. 490 [at 494], 83 L.Ed.2d 488.... Although a suspect need not "speak with the discrimination of an Oxford don," ... he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney. If the statement fails to meet the requisite level of clarity, *Edwards* does not require that the officers stop questioning the suspect. *See Moran v. Burbine*, 475 U.S. 412, 433, n. 4, 106 S.Ct. 1135 [1147, n. 4], 89 L.Ed.2d 410 (1986) ("the interrogation must cease until an attorney is present *only* [i]f the individual states that he wants an attorney")....

We decline petitioner's invitation to extend *Edwards* and require law enforcement officers to cease questioning imme-

diately upon the making of an ambiguous or equivocal reference to an attorney. The rationale underlying *Edwards* is that the police must respect a suspect's wishes regarding his right to have an attorney present during custodial interrogation. But when the officers conducting the questioning reasonably do not know whether or not the suspect wants a lawyer, a rule requiring the immediate cessation of questioning "would transform the *Miranda* safeguards into wholly irrational obstacles to legitimate police investigative activity...." (citations omitted).

*Davis*, 512 U.S. at 459–60, 114 S.Ct. at 2355–56 (holding the statement "[m]aybe I should talk to a lawyer," was not a request for counsel and did not require that interrogation cease).

■ While meeting with Thomley and Solicitor Rogers, Kennedy inquired, "What if I ask for an attorney?" We hold this ambiguous statement is not an invocation of Kennedy's right to counsel. Therefore, the officers were not required to stop questioning Kennedy.

■ Nevertheless, even if this statement invoked Kennedy's right to counsel, Kennedy thereafter waived this right when he initiated further discussions with the officers and later knowingly and intelligently waived his rights. *See Smith v. Illinois*, 469 U.S. 91, 105 S.Ct. 490, 83 L.Ed.2d 488 (1984). *See also Oregon v. Bradshaw*, 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983) (the Court held a statement from an accused such as, "Well, what is going to happen to me now," was sufficient "initiation" by the accused to warrant further communication by law enforcement officers although the accused had earlier invoked his right to counsel).

■ The evidence presented during the *Jackson v. Denno* hearing supports the trial court's conclusion the State met its burden of establishing by a preponderance of the evidence that the statements were freely and voluntarily given.

## JURY INSTRUCTION ON MALICE

Kennedy contends the trial judge's instruction on malice created a rebuttable presumption of malice. Because Kennedy did not object to the trial judge's instruction, this issue is not preserved. *State v. Torrence*, 305 S.C. 45, 406 S.E.2d 315 (1991).

## IMPROPER SENTENCING CONSIDERATIONS

Kennedy maintains the trial court erred by improperly considering Kennedy's exercise of his constitutional right to a jury trial as an influential factor in determining the appropriate sentence. Because Kennedy did not object to the sentence, this issue is not preserved. *See Torrence, supra.*

## CONCLUSION

Reviewing the record under the totality of circumstances test, we conclude the trial judge did not err in ruling Kennedy's statements were admissible. The State met its burden by a preponderance of the evidence in establishing Kennedy's statements were freely and voluntarily given without coercion, duress, or pressure. Further, the record establishes Kennedy voluntarily, knowingly, and intelligently waived his *Miranda* rights. In summary, there was no violation of Kennedy's right against self-incrimination under the Fifth and Fourteenth Amendments to the United States Constitution, as well as Article I, § 12 of the South Carolina Constitution. Moreover, there was no violation of his right to counsel as protected by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, as well as Article I, § 12 of the South Carolina Constitution.

Therefore, we find Kennedy's statements were properly admitted.

**AFFIRMED.**

CURETON and GOOLSBY, JJ., concur.