515 S.E.2d 508

The STATE, Respondent,

v.

Donney S. COUNCIL, Appellant.

No. 24932.

Supreme Court of South Carolina.

Heard Oct. 8, 1998.
Decided April 5, 1999.
Rehearing Denied May 14, 1999.

4

Assistant Appellate Defender Robert M. Dudek, of the South Carolina Office of Appellate Defense, of Columbia, for appellant.

Attorney General Charles M. Condon, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Donald J. Zelenka, Assistant Attorney General Lauri S. Soles, and Assistant Attorney General Robert E. Bogan, all of Columbia; and Solicitor Barbara R. Morgan, of Aiken, for respondent.

BURNETT, Justice:

Appellant was indicted for murder, kidnapping, administering poison, grand larceny of a vehicle, burglary, larceny, and two counts of criminal sexual conduct in the first degree. The jury found appellant guilty on all the charges. Appellant was sentenced to death for the murder;[1] thirty years concurrent for kidnapping;[2] a consecutive life sentence for the burglary; twenty years consecutive for administering a poison; thirty years consecutive for each charge of criminal sexual conduct; five years concurrent for grand larceny of a vehicle; and thirty days concurrent for petty larceny. We affirm.

---

**1.** The jury found the following statutory aggravating circumstances: (1) murder was committed while in the commission of criminal sexual conduct; (2) murder was committed while in the commission of kidnapping; (3) murder was committed while in the commission of burglary; (4) murder was committed while in the commission of a larceny with the use of a deadly weapon; (5) murder was committed while in the commission of killing by poison; and (6) murder was committed while in the commission of physical torture. S.C.Code Ann. § 16-3-25 (1985).

**2.** This sentence is ineffective in light of appellant's sentence under S.C.Code Ann. § 16-3-20 (1985). S.C.Code Ann. 16-3-910 (1985).

## FACTS

Late Thursday afternoon, October 8, 1992, Evelyn Helminiak visited with her neighbor Elizabeth Gatti, a seventy-two year old widow. Mrs. Gatti was preparing dinner when Mrs. Helminiak arrived. The next day, another neighbor, Charles Fields, became concerned about Mrs. Gatti because her morning newspaper was still in the driveway and her car was gone. Mr. Fields testified Mrs. Gatti was a creature of habit who retrieved her newspaper every morning at 4:30 a.m., read the paper, and threw it over to Mr. Fields' driveway by 8:00 a.m. so he could read it. When the newspaper was still in the driveway and the car was still gone on Friday evening, Mr. Fields called emergency services.

When the authorities entered Mrs. Gatti's house, perishable food items were found on the kitchen counter. Several of the rooms in Mrs. Gatti's house had been ransacked. Mrs. Gatti's body was discovered underneath a bedspread in her basement. She had been hogtied with a white cord and layers of duct tape were wrapped around her entire head. Her clothes had been ripped, and the crotch of her underwear had been cut out. Surrounding her body were various bottles of cleaning fluids. Mrs. Gatti had been sexually assaulted.

Dr. Nichols, the pathologist who performed the autopsy on Mrs. Gatti, testified her body was covered with numerous lacerations and bruises, and someone had attempted to manually strangle her. Further, a gaping laceration extending from her vagina into the rectal area indicated penetration by a very stiff foreign object. Dr. Nichols testified the cause of death was asphyxiation due to mechanical suffocation as a result of the duct tape, and contributory to the cause of death was the ingestion and aspiration of cleaning fluids and the binding ligatures on the wrists. Dr. Nichols testified the aspiration indicated Mrs. Gatti was forced to drink the cleaning fluids. According to Dr. Nichols, Mrs. Gatti lived 2–4 hours after the vaginal/rectal injury occurred.

On October 11, 1992, the authorities found Mrs. Gatti's car near an apartment complex where appellant sometimes stayed. Appellant was arrested for the crimes on October 12, 1992. In two separate statements, appellant admitted to being in Mrs. Gatti's house on the night she was killed;

however, he asserted he had gone to her house with a man identified as "Frankie J." [3] Appellant denied any wrongdoing; instead, he blamed the crimes on his companion. Appellant admitted, however, to SLED agent Wayne Mitchell that he had sexual intercourse with Mrs. Gatti. Further, appellant told SLED agent Danny Choate and Captain Wayne Huff, an investigator for the Aiken County Sheriff's Department, that he had sex with Mrs. Gatti.

A shoeprint taken from a chair in Mrs. Gatti's house was identified as matching shoes taken from appellant. Residue found on the chair positively matched debris found on appellant's shoes. Fingerprints taken from Mrs. Gatti's car and from items in her car were identified as belonging to appellant. Hair samples taken from appellant were consistent with hairs found in Mrs. Gatti's home. Semen taken from a tissue in Mrs. Gatti's house was consistent with appellant's semen. Several items identified as belonging to Mrs. Gatti were found in appellant's girlfriend's apartment.

Appellant's girlfriend's cousin, Earthlene Danley, testified she was in Mrs. Gatti's car with appellant the day after Mrs. Gatti's murder and had been with appellant when he went to a bank drive-thru in North Augusta and cashed a check he took from the glove compartment of Mrs. Gatti's car. Further, the testimony of bank employees and handwriting experts established appellant had forged three of Mrs. Gatti's checks and cashed them at various banks.

Mrs. Gatti's newspaper carrier positively identified appellant as the man she saw leaving Mrs. Gatti's house in the early morning hours of Friday, October 9, 1992.

### ISSUES

I. Did the trial judge err in qualifying Juror T?

II. Did the trial judge err in refusing to grant appellant's motion for a mistrial where a State's witness referred to appellant's prior criminal record during direct examination?

---

**3.** "Frankie J" was later identified as Frank Douglas. None of the physical evidence found in Mrs. Gatti's house or in her car matched Douglas.

III. Did the trial judge err in admitting appellant's inculpatory statements by finding appellant had waived his Sixth Amendment right to counsel prior to making these statements?

IV. Did the trial judge err in admitting mitochondrial DNA evidence?

V. Did the trial judge err in refusing to allow appellant to introduce polygraph evidence during the penalty phase of the trial?

## DISCUSSION

### I.

█ Appellant claims the judge erred in finding Juror T qualified because during her voir dire she was unable to definitely state she could presume appellant was innocent until the State proved his guilt beyond a reasonable doubt. We disagree.

Initially, when the trial judge questioned her during voir dire, Juror T expressed uncertainty as to whether she could presume appellant was innocent. However, after the trial judge explained the law, Juror T stated several times she could presume appellant innocent until the State proved his guilt beyond a reasonable doubt. Although Juror T continued to equivocate on some questions as to whether she could presume appellant innocent, each time the judge clearly explained the law to her, she affirmed she could presume appellant innocent. During examination by the solicitor, Juror T indicated she would follow the instructions and determine the facts from the evidence introduced during the trial. Further, on cross-examination by defense counsel, Juror T again stated she could presume appellant innocent. However, Juror T responded with uncertainty to defense counsel's final question.[4]

Defense counsel moved to disqualify Juror T for cause arguing the juror was unable to disregard her preconceived beliefs and presume appellant was innocent. Over appellant's

---

4. Defense Counsel posed the following question to Juror T:

Q. Okay. Can you tell me that you're coming in to this thing with a completely blank page and no feelings one way or another?

10

objection, the judge qualified Juror T. Juror T was placed on the jury after appellant had exhausted his peremptory challenges.

■ The constitutional standard of fairness requires that a defendant have a panel of impartial, indifferent jurors. U.S. Const. Amend. 14; *State v. Bell,* 302 S.C. 18, 393 S.E.2d 364, *cert. denied,* 498 U.S. 881, 111 S.Ct. 227, 112 L.Ed.2d 182 (1990).

■ In reviewing an error as to the qualification of a juror, this Court engages in a three step analysis. First, appellant must show that he exhausted all of his peremptory challenges. Second, if all peremptory challenges were used, this Court must determine if the juror was erroneously qualified. Third, appellant must demonstrate this error deprived him of a fair trial. *State v. Green,* 301 S.C. 347, 392 S.E.2d 157, *cert. denied,* 498 U.S. 881, 111 S.Ct. 229, 112 L.Ed.2d 183 (1990).

■ In a capital case, the proper standard in determining the qualification of a prospective juror is whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath. *State v. Green, supra* (citing *Wainwright v. Witt,* 469 U.S. 412, 424, 105 S.Ct. 844, 853, 83 L.Ed.2d 841 (1985)); *State v. George,* 323 S.C. 496, 476 S.E.2d 903 (1996), *cert. denied,* 520 U.S. 1123, 117 S.Ct. 1261, 137 L.Ed.2d 340 (1997). The determination of whether a juror is qualified to serve on a death penalty case is within the sole discretion of the trial judge and is not reviewable on appeal unless wholly unsupported by the evidence. *State v. Davis,* 309 S.C. 326, 422 S.E.2d 133 (1992), *cert. denied,* 508 U.S. 915, 113 S.Ct. 2355, 124 L.Ed.2d 263 (1993). When reviewing the trial court's qualification or disqualification of prospective jurors, the responses of the challenged jurors must be examined in light of the entire voir dire. *State v. Green, supra.* The ultimate consideration is that the juror be unbiased, impartial and able to carry out the law as explained to him. *Id.*

After reviewing the entire voir dire of Juror T, we conclude the trial judge did not err in qualifying this juror. After the trial judge explained the law to Juror T, she stated repeatedly she could presume appellant was innocent until and unless the

State proved him guilty. Further, Juror T stated she could follow the judge's instructions. Although Juror T expressed uncertainty in her response to the final question posed by defense counsel, as pointed out by the trial judge, this question was ambiguous and prospective jurors never responded correctly.[5] Juror T's equivocation when asked this ambiguous question does not negate her previous definite answers. *See State v. Holmes*, 320 S.C. 259, 464 S.E.2d 334 (1995), *cert. denied*, 517 U.S. 1248, 116 S.Ct. 2507, 135 L.Ed.2d 197 (1996) (after reviewing Juror Hutto's entire voir dire, this Court concluded there was no abuse of discretion in qualifying her to serve even though at the outset of voir dire, Juror Hutto stated she thought a defendant had to prove his or her innocence; however, when told the law presumed a defendant was innocent, and asked if she could follow this presumption, she answered yes).

## II.

Appellant argues the trial judge erred in refusing to grant a mistrial when SLED agent Charles Counts testified he retrieved appellant's fingerprint card from SLED records for comparison. Appellant claims this testimony was highly prejudicial because it was a clear reference to appellant's prior criminal activity.

Charles Counts, a crime scene processor for SLED, testified he met appellant on October 11, 1992, while he was processing Mrs. Gatti's car for evidence. At this initial meeting, appellant, who identified himself as "James Counts," provided authorities with his fingerprints. Counts testified appellant's fingerprints were found on Mrs. Gatti's car and on items found in her car. The solicitor asked Counts to "tell the members of the jury how many different sets of fingerprints you had looked at to compare, and the names of the individuals submitted to you to compare." Counts responded:

At the time of the initial comparison, I was supplied or had in my possession, fingerprints, one fingerprint, an inked palm impression bearing the name of James Counts which I had taken on October the 11th at the apartment complex. A few days later or a day later, I was contacted by the

---

5. The correct response would be, "No, I am for the defendant."

12

sheriff's department and said, "that subject is actually Mr. Council." *I went over to the SLED records, two buildings over, retrieved a card with the name Council on it* and compared those impressions and in fact, they were produced by the same individual.

(emphasis added).

Defense counsel moved for a mistrial arguing Counts' testimony implied to the jury appellant "had a prior criminal record, that he had been printed before." Defense counsel stated in deciding whether appellant would testify much thought was given to whether appellant would be harmed by having his prior criminal record admitted into evidence. Further, defense counsel pointed out to the court that great efforts had been made to exclude references to any prior record from the statements made by appellant. Defense counsel argued because a state's witness had informed the jury that appellant had a fingerprint card at SLED, the jury now "knows that Mr. Council has a prior criminal record, and based upon that, I don't think there's any way to give a curative instruction to get the jury to forget that."

The trial judge agreed that a curative instruction would only make the situation worse. However, the trial judge refused to grant a mistrial because he found Counts' statement could be construed several ways, including Counts re-inked appellant. The trial judge found the jury probably missed the implication, and further, because appellant had already put his own credibility at issue by lying to the authorities about his identity when he provided them with his fingerprints, testimony attacking appellant's credibility, including his prior criminal record, was admissible.[6]

The decision to grant or deny a motion for a mistrial is a matter within a trial court's sound discretion, and such a decision will not be disturbed on appeal absent an abuse of discretion amounting to an error of law. *State v.*

---

6. The trial judge was incorrect in finding appellant had put his character in issue by lying to the authorities. An accused must introduce evidence of his character at trial before the prosecution can attack it. *See* Rule 404(a), SCRE. Here, because appellant never testified or offered other evidence of his good character, his character was never an issue.

*Simpson*, 325 S.C. 37, 479 S.E.2d 57, *cert. denied*, 520 U.S. 1277, 117 S.Ct. 2460, 138 L.Ed.2d 217 (1997); *State v. Wasson*, 299 S.C. 508, 386 S.E.2d 255 (1989). A mistrial should not be granted unless absolutely necessary. *State v. Wasson*, 299 S.C. 508, 386 S.E.2d 255 (1989). Instead, the trial judge should exhaust other methods to cure possible prejudice before aborting a trial. *Id.* In order to receive a mistrial, the defendant must show error and resulting prejudice. *Id.*

In this case, it is questionable whether the jury even understood the implication of Count's statement. This Court has held that similar references to a defendant's past conduct were too vague to be prejudicial. *See State v. Singleton*, 284 S.C. 388, 326 S.E.2d 153 *cert. denied*, 471 U.S. 1111, 105 S.Ct. 2346, 85 L.Ed.2d 863 (1985) (references to appellant's prior crimes were vague); *State v. George, supra* (appellant's possible drug dealing was merely suggested and no testimony was presented concerning such behavior). Further, the State never attempted to introduce appellant's prior criminal record during the guilt phase of the trial. Instead, only an inadvertent vague reference was made to appellant's prior record. *See State v. Robinson*, 238 S.C. 140, 119 S.E.2d 671 (1961) (this Court pointed out that even if the testimony created the inference in the jury's mind that the accused had committed another crime the State never attempted to prove the accused had been convicted of some other crime). Thus, we conclude this reference was not prejudicial.[7]

### III.

▆▆▆ Appellant claims the trial judge erred in admitting into evidence appellant's inculpatory statements made to SLED agents Wayne Mitchell and Danny Choate and to Captain Wayne Huff on October 19, 1992, because they were

---

7. This case can be distinguished from *State v. Tate*, 288 S.C. 104, 341 S.E.2d 380 (1986), where the Court found the error was prejudicial. In *Tate*, appellant's mug shot was introduced into evidence. The date on the mug shot was almost one year prior to the trial thus inferring to the jury that appellant had a prior criminal record. In this case, the fingerprint card was never introduced into evidence, and therefore the jury was not aware of when SLED obtained the card. Therefore, there was no evidence before the jury of when or for what purpose the fingerprint card was made.

14

obtained in violation of his Sixth Amendment [8] right to counsel. We disagree.

The trial judge held a *Jackson v. Denno*[9] hearing to determine the admissibility of four statements made by appellant to various authorities about his involvement in Mrs. Gatti's murder. The first statement was made on October 12, 1992, the day of appellant's arrest. In this statement, appellant admitted he was present at Mrs. Gatti's house, but blamed Frank Douglas for the crimes.

Appellant was arraigned on October 14, 1992. In response to appellant's request at the arraignment, an attorney was appointed to represent him on October 16, 1992. At the *Jackson v. Denno* hearing, appellant testified he was not aware an attorney had been appointed to represent him. Appellant had not spoken with an attorney prior to October 19, 1992. According to appellant, he only agreed to take a polygraph exam on October 19, 1992. He did not agree to the questioning.

Investigator Norwood Bodie testified appellant "got word to us that he wanted to talk to us" on October 19, 1992. Bodie obtained a written request from appellant, which stated: "I, Donney S. Council, do wish to speak with investigators of the Aiken County Sheriff's Office and SLED." It was signed by appellant and witnessed by Bodie and Officer Stuart. Appellant was then taken to the Sheriff's Office where Captain Huff informed appellant of his *Miranda*[10] rights and appellant waived his rights. Appellant was then interviewed by Huff, Bodie, and SLED agent Choate. In the October 19th statement, appellant again stated he had accompanied Frank Douglas to Mrs. Gatti's house, but claimed he had not participated in the crimes.

Appellant then wrote and signed a statement requesting that he be given a polygraph exam. Huff and Choate transported appellant to Columbia to be examined at SLED. After

8. U.S. Const. 6th Amend.

9. 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964).

10. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

explaining to appellant his rights and having appellant waive them, SLED agent Mitchell administered the exam. After the exam, Mitchell told appellant his answers showed deception. Appellant then admitted to Mitchell he had sexual intercourse with Mrs. Gatti. Mitchell related appellant's admission to Huff and Choate.

On the return trip to Aiken, appellant told Huff and Choate several times: "Y'all ain't got shit on me." Huff told appellant: "Donney, you don't know what we have on you.... Well we've got more than you think and the best thing to do is let's not talk about it." Appellant responded: "Well, you don't have any fingerprints.... Had I done something like that I would have been wearing gloves or socks." Huff and Choate began to talk to each other and ignore appellant. Appellant again began to talk and Choate told appellant to be quiet. Appellant then blurted out: "Well, I did fuck her. The bitch didn't have good pussy, so I made her give me a blow job." Huff testified appellant laughed when he made these statements. Choate pulled the car over and Huff made some notes about appellant's statement. Appellant denied making the inculpatory statements to Mitchell, Huff and Choate.

Defense counsel argued appellant was denied his Sixth Amendment right to counsel when he made these inculpatory statements on October 19, 1992. Defense counsel claimed appellant did not fully understand his right to talk with an attorney; therefore, the waiver of his *Miranda* rights was not voluntary. The trial judge admitted all four statements.

The Sixth Amendment right to counsel attaches when adversarial judicial proceedings have been initiated and at all critical stages. *Michigan v. Jackson*, 475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986); *State v. Register*, 323 S.C. 471, 476 S.E.2d 153 (1996), *cert. denied*, 519 U.S. 1129, 117 S.Ct. 988, 136 L.Ed.2d 870 (1997); *State v. Kennedy*, 325 S.C. 295, 479 S.E.2d 838 (Ct.App.1996). The Sixth Amendment right attaches only "post-indictment," at least in the questioning/statement setting. *Michigan v. Harvey*, 494 U.S. 344, 110 S.Ct. 1176, 108 L.Ed.2d 293 (1990); *State v. Register, supra*. When the Sixth Amendment right to counsel has attached, if police initiate interrogation after a defendant's assertion, at an arraignment or other similar proceedings, of his right to

counsel, any waiver of the defendant's right to counsel for that police initiated interrogation is invalid unless the defendant initiates the contact himself. *Michigan v. Jackson, supra; State v. Howard,* 296 S.C. 481, 374 S.E.2d 284 (1988).

Appellant's Sixth Amendment right to counsel attached on October 14, 1992, when he was arraigned. Further, appellant asserted his right to counsel on October 14, 1992, when he requested appointment of counsel. Counsel was appointed to represent appellant on October 16, 1992.

However, appellant initiated the contact with the authorities on October 19, 1992; therefore, appellant's subsequent waiver of his right to counsel was knowingly and intelligently made, and all his statements made on this day were admissible.[11] *See State v. Howard, supra* (assuming defendant's right to counsel had attached, defendant had waived that right because he initiated the contact with the police); *Compare with Michigan v. Jackson, supra* (defendant's waiver of his Sixth Amendment right to counsel was invalid where police initiated the contact). Under the Sixth Amendment, a defendant who has asserted his right to counsel is always free to initiate contact with the authorities and waive this right. A defendant is not required to consult with an attorney prior to initiating contact in order for the waiver to be valid.

Appellant argues he only contacted the authorities in order to let them know he was ready to take a polygraph exam that he previously agreed to take at some time during the October 12, 1992 questioning. However, his note does not indicate such a limited purpose.

Further, although appellant was clearly in custody when he admitted to Huff and Choate he had sex with Mrs. Gatti, appellant's statement was not the result of interrogation.

---

11. Appellant argues he could not have knowingly waived his right to counsel since he was unaware counsel had been appointed. Further, appellant claims knowledge that counsel had been appointed for him should have been imputed from the court to the sheriffs department. Because we find appellant initiated the contact with the authorities, it does not matter whether appellant was unaware counsel had been appointed nor does it matter whether knowledge of that appointment is imputed from one state actor to another.

Instead, his statement was volunteered. *See Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980); *State v. Koon,* 278 S.C. 528, 298 S.E.2d 769 (1982).

## IV.

■ During the guilt phase of appellant's trial, John Ortuno, a trace evidence examiner at SLED, testified the characteristics of pubic hairs found at the crime scene were consistent with appellant's pubic hair. Ortuno further determined Frank Douglas could not have been the donor of the hair.

To confirm Ortuno's findings, the State sought to introduce testimony from Joseph Dizinno of the F.B.I. laboratory regarding the results of mitochondrial DNA (mtDNA) analysis performed on the hairs.[12] The trial judge held an *in camera* hearing to determine the admissibility of this evidence.

Dizinno testified he had extensive training in both hair and fiber analysis and mtDNA analysis. Dizinno testified his mtDNA analysis research began in 1992. Dizinno chose to sequence two regions of the mtDNA because research conducted in Europe in 1983 found these two areas to be very variable between individuals. Dizinno testified mtDNA analysis has been used for research purposes since 1981 and over 600 papers have been written about mtDNA research. He testified mtDNA analysis is a recognized methodology that has been used for many purposes, including to identify bodies from the Vietnam War and the Gulf War. Dizinno stated the mtDNA analysis has been reaffirmed in the scientific community as reliable science. Dizinno testified his laboratory start-

---

12. Mitochondrial DNA is found in mitochondria, which are organelles contained within the cytoplasm of a cell and which serve as the cell's energy factories. Unlike nucleus DNA that contains genetic material inherited from both the mother and the father, mtDNA only contains genetic material inherited from the mother. Two advantages of mtDNA are that there are many more copies of mtDNA in the cell than there are copies of nuclear DNA since each cell contains many mitochondria but only one nucleus and mtDNA is much more stable than nuclear DNA; therefore, the chances of extracting mtDNA from a degraded sample is increased. Further, unlike nuclear DNA which is only present in the living cells at the roots of a pulled hair, mtDNA is present in the shafts of hair. Brian Huseman, *Taylor v. State, Rule 706, and the DNA Database: Future Directions in DNA Evidence,* 22 Oklahoma City University L.Rev. 397 (1997).

ed to use this technology to analyze forensic evidence in the summer of 1996. Further, this was the second occasion someone from his lab had testified regarding the results obtained from a mtDNA analysis.[13] Dizinno stated that mtDNA analysis confirms, based on a scientific objective standard, the subjective microscopical comparison performed on the hairs.

Dizinno explained that mtDNA analysis is performed by extracting the DNA from mitochondria. This DNA is then amplified and examined to determine its sequences of As, Gs, Ts, and Cs. This sequence is then compared to a sequence donated by a known person. If the sequence is different, the person donating the known sample can be eliminated as the donor of the unknown sample. If the sequence is the same, the examiner compares the sequence to the database of mtDNA sequences available to him to determine if he has ever seen that same sequence. Validation studies showed that about 62% of the hairs analyzed were sequenced on the first try. The other 38% could not be sequenced because the DNA could not be extracted. Of the 62% that could be sequenced, the reliability of getting a correct sequence was 100%.

The database used by Dizinno contained 742 known sequences of which 319 were sequences obtained from African–Americans.[14] Dizinno testified that while he had found a match between unrelated Caucasians, he had never found a match between unrelated African–Americans. According to Dizinno, the two regions analyzed are most variable in African–Americans.

The results of this analysis excluded Frank Douglas as the one who deposited the hair found at the crime scene. Further, Dizinno could not exclude appellant as the one who deposited the hair found at the crime scene. Based on the available database, Dizinno testified that most probably the hair that was recovered from the crime scene belonged to

13. The first occasion was at a trial in a Tennessee state court, six weeks prior to appellant's trial. Tennessee has a statute which allows DNA tests to be used as evidence in criminal cases under certain circumstances. Mark Curriden, *A New Evidence Tool: First Use of Mitochondrial DNA Test in a U.S. Criminal Trial,* 82–Nov. A.B.A. J. 18 (1996).

14. Appellant is an African–American.

appellant. However, Dizinno admitted it was possible that the hair belonged to another individual.

The trial judge found the evidence admissible under Rules 702 and 703, SCRE. In an abundance of caution, the trial judge further found the evidence admissible under *State v. Jones*, 273 S.C. 723, 259 S.E.2d 120 (1979), and under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The trial judge noted the process had been subjected to peer review and publication; a known potential rate of error existed; standards controlled the techniques and operations; the F.B.I. laboratory validated the process; this technology and underlying science has been accepted in the scientific community; and while forensic application of this technology was a recent development, the technology had been used for other purposes.

Appellant argues the trial judge erred in admitting the mtDNA test results in this case because the forensic application of this process was novel and had not yet gained general acceptance in the scientific community. We disagree.

Appellant is attempting to apply the standard set out in *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923). In *Frye*, the court held scientific evidence only became reliable, and therefore admissible, when it had attained the general acceptance of the scientific community as a whole. However, this Court has never adopted that standard. Instead, prior to 1990, the standard for admitting scientific evidence in South Carolina was "the degree to which the trier of fact must accept, on faith, scientific hypotheses not capable of proof or disproof in court and not even generally accepted outside the courtroom." *State v. Jones*, 273 S.C. 723, 731, 259 S.E.2d 120, 124 (1979). This standard is more liberal than the *Frye* standard.

In considering the admissibility of scientific evidence under the *Jones* standard, the Court looks at several factors, including: (1) the publications and peer review of the technique; (2) prior application of the method to the type of evidence involved in the case; (3) the quality control procedures used to ensure reliability; and (4) the consistency of the method with recognized scientific laws and procedures. *State v. Ford*, 301 S.C. 485, 392 S.E.2d 781 (1990). This type of

evidence is also subject to attack for relevancy and prejudice. *Ford, supra.*

In 1990, South Carolina adopted Rule 24, SCRCrimP, which is identical to Rule 702 of the Federal Rules of Evidence (FRE). In 1995, South Carolina replaced Rule 24 with Rule 702, SCRE.[15] This rule is identical to its predecessor, Rule 24, SCRCrimP, and Rule 702, FRE.

In 1993, the United States Supreme Court found the Frye test had been superseded by the FRE and adopted new parameters for admissibility under Rules 702 and 703. *Daubert v. Merrell Dow Pharmaceuticals, Inc., supra.* Before scientific evidence is admitted, the trial judge must determine the evidence is relevant, reliable and helpful to the jury. The Court suggested four factors to consider in deciding reliability in scientific evidence cases: (1) scientific methodology; (2) peer review; (3) consideration of general acceptance; and (4) the rate of error of a particular technique. *Id.* The Court stated if the evidence is reliable and relevant, the judge should determine if the probative value of the evidence is outweighed by its prejudicial effect. *Id.* The Court recently held the standard of review of a lower court's decision to admit or exclude evidence under *Daubert* is an abuse of discretion. *General Elec. Co. v. Joiner,* 522 U.S. 136, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997).

 While this Court does not adopt *Daubert,* we find the proper analysis for determining admissibility of scientific evidence is now under the SCRE. When admitting scientific evidence under Rule 702, SCRE, the trial judge must find the evidence will assist the trier of fact, the expert witness is qualified, and the underlying science is reliable. The trial judge should apply the *Jones* factors to determine reliability. Further, if the evidence is admissible under Rule 702, SCRE, the trial judge should determine if its probative value is outweighed by its prejudicial effect. Rule 403, SCRE. Once

---

15. Rule 702, SCRE, states:

If the scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

the evidence is admitted under these standards, the jury may give it such weight as it deems appropriate.

We conclude the trial judge was well within his discretion in finding the results of the mtDNA analysis admissible under the *Jones* factors and Rule 702, SCRE. *State v. Von Dohlen,* 322 S.C. 234, 471 S.E.2d 689, *cert. denied,* 519 U.S. 972, 117 S.Ct. 402, 136 L.Ed.2d 316 (1996) (the admission of expert testimony is within the discretion of the trial court); *State v. Bailey,* 276 S.C. 32, 274 S.E.2d 913 (1981) (the admissibility of evidence is within the trial court's discretion). This evidence assists the jury in determining whether appellant committed the crimes because it provides an objective confirmation of the subjective microscopical comparison performed on the hairs. Mitochondrial DNA analysis has been subjected to peer review and many articles have been published about this technology. The F.B.I. laboratory validated the process and determined its rate of error. Its underlying science has been generally accepted in the scientific community. Further, while forensic application of mtDNA analysis is fairly new, the technology has been used in other contexts for several years.

■■■ Appellant further argues the trial judge erred in admitting this evidence because he was not given a sufficient opportunity to rebut the evidence.[16] We disagree.

When defense counsel requested that the State have the hair analyzed using a mtDNA test, counsel was assured the results would be available several months before trial. However, the analysis was delayed, and defense counsel was advised of the results of the mtDNA analysis the night before appellant's trial. Therefore, defense counsel did not have time to locate an expert witness to contradict the admitted testimony. However, defense counsel was able to talk to Dizinno prior to an *in camera* hearing and was able to vigorously cross-examine Dizinno during the *in camera* hearing and when Dizinno testified before the jury.

This Court has noted that "vigorous cross examination, presentation of contrary evidence and careful instructions on the burden of proof are the traditional appropriate means of

---

16. Appellant did not expressly ask for a continuance; instead, he argued the trial judge could not make a determination of the admissibility of the mtDNA analysis without sufficient rebuttal evidence.

attacking shaky but admissible evidence." *State v. Dinkins,* 319 S.C. 415, 418, 462 S.E.2d 59, 60 (quoting *Daubert,* 509 U.S. at 596, 113 S.Ct. at 2798).

In our opinion, appellant sufficiently rebutted this evidence. Dizinno admitted on cross-examination that it was possible the hair belonged to someone other than appellant. Further, the size of the mtDNA database and the fact that Dizinno had previously found matches between unrelated Caucasians were exposed during his testimony. Because defense counsel effectively demonstrated the flaws in mtDNA analysis, further preparation was not necessary. Moreover, although defense counsel indicated he would like to retain his own expert witness to counter this evidence, in our opinion, defense counsel's cross-examination of Dizinno effectively encompassed the points his own expert would probably discuss. We note that appellant does not suggest in his brief any other facts that should have been but were not brought out by Dizinno in his testimony concerning mtDNA analysis. Thus, the trial judge had sufficient information on which to evaluate his decision on the admissibility of this evidence and the jury had sufficient testimony on which to decide whether to rely on this evidence.

## V.

Appellant argues the trial judge erred in excluding testimony during the penalty phase about the results of a polygraph examination administered to Frank Douglas. Specifically, appellant claims the trial judge erred in finding the results of a polygraph test are per se inadmissible.

During the investigation of Mrs. Gatti's murder, SLED conducted a polygraph exam on Frank Douglas to determine whether he had any knowledge of or involvement in Mrs. Gatti's death. The test indicated deception.[17]

Prior to appellant's trial, defense counsel made a motion to admit the polygraph results of the test administered to Douglas. He moved to admit the results in the guilt phase for

---

17. SLED also administered a polygraph exam on appellant. Appellant's exam also indicated deception.

impeachment purposes if Douglas testified [18] and in the penalty phase as evidence in mitigation because the polygraph results were probative of whether appellant was acting under the influence of a more culpable participant in the crimes.[19] Pursuant to the motion, the trial judge appointed an expert, Richard Rackliff, to review the polygraph test and results and to prepare a report. During a lengthy *in camera* hearing, the polygraph examiner, SLED agent Mitchell, and Rackliff testified. Mitchell testified John Hopkins University had developed a computer program for scoring the exam. This program made the results of the exam more objective because it eliminated the subjectiveness of a single examiner in scoring an exam. However, the results from the exam still only indicate if a person showed deception on certain questions. Thus, according to both Mitchell and Rackliff, while the scoring had improved, a polygraph exam still is unable to tell if a person is actually lying.

Relying on this Court's precedents, the trial court found the results of the polygraph exam were inadmissible. The trial judge found the underlying science of polygraph had not improved and had been found unreliable by this Court.

This Court has consistently held the results of polygraph examinations are generally not admissible because the reliability of the tests is questionable.[20] *State v. Wright,* 322 S.C. 253, 471 S.E.2d 700 (1996); *State v. Copeland,* 278 S.C. 572, 300 S.E.2d 63 (1982). Further, this Court has declined to admit in mitigation the results of a polygraph exam offered during the penalty phase of a trial.[21] *Copeland, supra.*

---

18. Douglas did not testify. Therefore, whether this evidence could be admitted for impeachment purposes is moot.

19. S.C.Code Ann. § 16–3–20(b)(4) & (5) (1985).

20. Some jurisdictions have abandoned the *per se* rule excluding the admission of polygraph evidence into evidence. *United States v. Cordoba,* 104 F.3d 225 (9th Cir.1997); *United States v. Posado,* 57 F.3d 428 (5th Cir.1995); *Meyers v. Arcudi,* 947 F.Supp. 581 (D.Conn.1996) (listing factors to consider when determining admissibility of polygraph results); *State v. Baca,* 120 N.M. 383, 902 P.2d 65 (1995) (Rule 707 of the New Mexico's Rules of Evidence provides guidelines for the admissibility of polygraph results).

21. *Copeland* was decided prior to the adoption of Rule 24, SCRCrimP, or Rule 702, SCRE.

The United States Supreme Court has recently found that a per se rule against the admission of polygraph evidence does not violate a defendant's right to present relevant evidence in his defense as guaranteed by the U.S. Constitution. *United States v. Scheffer*, 523 U.S. 303, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998). In *Scheffer*, the Court recognized, "there is simply no consensus that polygraph evidence is reliable. To this day, the scientific community remains extremely polarized about the reliability of polygraph techniques." *Scheffer*, 118 S.Ct. at 1265.

In our opinion, the trial judge did not abuse his discretion in refusing to admit the polygraph evidence. *State v. Von Dohlen, supra* (admission of expert testimony is within the discretion of the trial judge). However, in light of the adoption of the SCRE, admissibility of this type of scientific evidence should be analyzed under Rules 702 and 403, SCRE and the *Jones* factors.

After an analysis under these standards, we find the polygraph evidence inadmissible in this case.[22] The evidence is not probative on the issue of whether appellant was acting under the influence of Douglas. Unless the jury is allowed to speculate, the fact that Douglas' exam showed deception does not prove that Douglas was lying or that Douglas committed the crimes against Mrs. Gatti. Douglas' deception on the polygraph test fails to support appellant's assertion that Douglas committed the crimes. Therefore, this evidence does not assist the jury. *See* Rule 702, SCRE. Further, because it would only confuse and mislead the jury, any probative value of this evidence would be outweighed by its prejudicial effect. Rule 403, SCRE.

## *PROPORTIONALITY REVIEW*

After reviewing the entire record, we conclude the death sentence was not the result of passion, prejudice, or any

---

22. Other jurisdictions have continued to find polygraph evidence inadmissible after *Daubert*. *See State v. Porter*, 39 Conn.App. 800, 668 A.2d 725 (1995) (even in light of *Daubert*, polygraph evidence is inadmissible due to questionable accuracy); *State v. Beard*, 194 W.Va. 740, 461 S.E.2d 486 (1995) (despite the fact that the court had previously adopted *Daubert*, the court found polygraph evidence inadmissible).

other arbitrary factor, and the jury's finding of statutory aggravating circumstances is supported by the evidence. *See* S.C.Code Ann. § 16–3–25 (1985). Further, the death penalty is neither excessive nor disproportionate to that imposed in similar cases. *See State v. Whipple*, 324 S.C. 43, 476 S.E.2d 683, *cert. denied*, 519 U.S. 1045, 117 S.Ct. 618, 136 L.Ed.2d 541 (1996); *State v. Holmes*, 320 S.C. 259, 464 S.E.2d 334 (1995), *cert. denied*, 517 U.S. 1248, 116 S.Ct. 2507, 135 L.Ed.2d 197 (1996); *State v. Tucker*, 319 S.C. 425, 462 S.E.2d 263 (1995), *cert. denied*, 516 U.S. 1080, 116 S.Ct. 789, 133 L.Ed.2d 739 (1996); *State v. Singleton*, 284 S.C. 388, 326 S.E.2d 153, *cert. denied*, 471 U.S. 1111, 105 S.Ct. 2346, 85 L.Ed.2d 863 (1985).

**AFFIRMED.**

TOAL, MOORE and WALLER, JJ., concur.

FINNEY, C.J., dissenting in separate opinion.

FINNEY, Chief Justice:

I respectfully dissent. The majority announces a new test to be applied in determining the admissibility of scientific evidence. This is a two part test, first requiring an inquiry under Rule 702, SCRE, followed by an analysis under Rule 403, SCRE. The trial judge did not have the benefit of this new rule, and therefore could not and did not apply it in determining the admissibility of the mtDNA evidence. Justice requires that we reverse and remand appellant's conviction and sentence for a new trial in which this novel scientific evidence is subjected to the newly formulated test.

I am also deeply concerned by the admission of appellant's statements. His sixth amendment right to counsel attached at his arraignment, *Moorer v. State*, 244 S.C. 102, 135 S.E.2d 713 (1964), and then again at the time of his polygraph examination. *State v. Grizzle*, 293 S.C. 19, 358 S.E.2d 388 (1987). In my opinion, the record is less than clear that, assuming that appellant waived his right following the arraignment, he was ever reinformed and then knowingly, intelligently, and voluntarily waived this right before the polygraph examination was administered.

For the reasons given above, I would reverse and remand for a new trial.