783 S.E.2d 823

**The STATE, Respondent,**

**v.**

**Marc A. PALMER, Appellant.**

**Appellate Case No. 2013–000700.**
**No. 5382.**

Court of Appeals of South Carolina.

Heard Nov. 3, 2015.
Decided Feb. 24, 2016.
Rehearing Denied April 21, 2016.

without consent, and possession of a stolen vehicle. He was also cross-examined as to his status as a convicted felon.

504

508

_____

Ryan Lewis Beasley, of Ryan L. Beasley, P.A., of Greenville, and Chief Appellate Defender Robert Michael Dudek, of Columbia, for appellant.

Attorney General, Alan McCrory Wilson, Chief Deputy Attorney General, John W. McIntosh, Assistant Deputy Attorney General, Donald J. Zelenka, and Assistant Attorney General, Alphonso Simon, Jr., all of Columbia, and Solicitor Ernest Adolphus Finney, III, of Sumter, for respondent.

SHORT, J.

Marc Palmer appeals his convictions for murder and possession of a weapon during the commission of a violent crime. He argues the trial court erred in: (1) granting the State's *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), motion; (2) denying his motion for a mistrial and a motion for a new trial; (3) denying his motion for a speedy trial; (4) admitting his statement to law enforcement after he invoked his right to counsel; and (5) sentencing him for possession of a weapon during the commission of a violent crime after sentencing him to life imprisonment without parole for murder. We affirm and vacate in part.

**FACTS**

On October 28, 2010, at about 10:30 p.m., Therris Keels (Victim) was shot and killed. Victim was shot twice: once in the head and once in the abdomen.

There were several witnesses to the shooting. Maurice Smith saw Palmer point a gun at Victim. Victim put his hands up as if to let Palmer know he did not have a gun. Palmer shot Victim two times and walked away. He then turned around, shot Victim another time as he lay on the ground, and ran off. Smith then heard the familiar squealing sound of Palmer's car.

Brittany Croskey also observed the shooting. She saw someone pacing back and forth along the road and recognized the distinctive walk as belonging to Palmer. She saw Victim hold his hands up and heard two gun shots. She then saw the person who was pacing walk over to Victim, who was on the ground, and shoot him again.

Levar Wesley Walker saw a man walk towards Victim, and Victim held his hands out. The man then reached in his pants, pulled out a gun, and shot Victim two times. He testified the man had a "ponytail puffed up with hair." Walker said that prior to the shooting, he had seen Palmer wear his hair in a "ponytail puffed out."

Witnesses also testified that Victim and Palmer had a history of fighting. Smith testified he saw Palmer and Victim in a physical fight prior to the night Victim was shot, and Palmer told Victim it "wasn't over." Smith also saw Palmer fighting a few weeks prior to the shooting with another man, Dominique McBride, and during the fight, Palmer "dropped" a gun.

Detrel Matthews likewise testified he saw Palmer and Victim in an argument prior to the shooting. Matthews also saw Palmer fight McBride a few weeks prior to the shooting and saw what appeared to be a gun fall out of Palmer's waistband. Investigator Wayne McFadden with the Williamsburg County Sheriff's Office testified Matthews told him his brother returned a .45 caliber handgun to Palmer before the shooting.

Investigator McFadden obtained surveillance video from a business close to the shooting, and observed a greenish-colored Neon, missing a hubcap on the front driver's-side tire, traveling down the road at about the same time the 9–1–1 call was received. Smith testified Palmer drove a greenish-blueish Neon. Palmer later admitted it was his car on the video. Police recovered three .45–caliber shell casings from the scene of the shooting.

John Creech, a senior agent with the South Carolina Law Enforcement Division (SLED), interviewed Palmer on October 29, 2010, at 4:40 p.m. He gave Palmer his *Miranda*[1] rights,

---

1. *Miranda v. Arizona*, 384 U.S. 436, 475, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

and Palmer waived them. Palmer told the police he and Victim had an argument earlier on the day of the shooting. He said he left the club that night at about 10:10 p.m. and drove until he ran out of gas. He then called a person named "Smoke" for a ride home at 3:00 a.m. Creech testified no one could account for Palmer's whereabouts from 10:10 p.m. until 3:00 a.m. Investigator McFadden viewed video surveillance at a gas station where Palmer told police he was during the time of the shooting, but he did not see Palmer's vehicle on the footage. The police did not find any gunshot residue or blood on Palmer's clothes. No fingerprints were found on the shell casings or a soda can found at the scene of the shooting. The only DNA recovered that could be analyzed belonged to Victim.

A trial was held March 11–14, 2013. The jury found Palmer guilty of murder and possession of a weapon during the commission of a violent crime. Palmer moved for a new trial for the same reasons asserted in his motion for directed verdict, motion for mistrial, motion in limine, and a speedy trial. The court denied the motion. The court sentenced him to life in prison for murder, plus five years for possession of a weapon during the commission of a violent crime, to be served consecutively. This appeal followed.

## STANDARD OF REVIEW

In criminal cases, this court sits to review errors of law only, and is bound by the trial court's factual findings unless those findings are clearly erroneous. *State v. Edwards*, 384 S.C. 504, 508, 682 S.E.2d 820, 822 (2009). Thus, on review, the court is limited to determining whether the trial court abused its discretion. *Id.* An abuse of discretion occurs when the court's decision is unsupported by the evidence or controlled by an error of law. *State v. Black*, 400 S.C. 10, 16, 732 S.E.2d 880, 884 (2012). The appellate court "does not re-evaluate the facts based on its own view of the preponderance of the evidence but simply determines whether the trial court's ruling is supported by any evidence." *Edwards*, 384 S.C. at 508, 682 S.E.2d at 822.

## LAW/ANALYSIS

### I. Preemptory Challenges

Palmer argues the trial court erred in granting the State's *Batson v. Kentucky* motion. We disagree.

In *Batson*, 476 U.S. at 89, 106 S.Ct. 1712, the Supreme Court of the United States held the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States forbids a prosecutor from challenging potential jurors solely on account of their race or on the assumption that African American jurors as a group will be unable to impartially consider the State's case against an African American defendant. In *Georgia v. McCollum*, 505 U.S. 42, 59, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992), the Supreme Court held the Constitution also prohibits a criminal defendant from engaging in purposeful racial discrimination in the exercise of peremptory challenges. Additionally, the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States prohibits the striking of a potential juror based on race or gender. *State v. Evins*, 373 S.C. 404, 415, 645 S.E.2d 904, 909 (2007). When one party strikes a member of a cognizable racial group or gender, the trial court must hold a *Batson* hearing if the opposing party requests one. *State v. Haigler*, 334 S.C. 623, 629, 515 S.E.2d 88, 90 (1999).

In *State v. Giles*, our supreme court explained the proper procedure for a *Batson* hearing:

First, the opponent of the peremptory challenge must make a prima facie showing that the challenge was based on race. If a sufficient showing is made, the trial court will move to the second step in the process, which requires the proponent of the challenge to provide a race neutral explanation for the challenge. If the trial court finds that burden has been met, the process will proceed to the third step, at which point the trial court must determine whether the opponent of the challenge has proved purposeful discrimination.

407 S.C. 14, 18, 754 S.E.2d 261, 263 (2014) (internal citations omitted).

"While '[m]erely denying a discriminatory motive' is insufficient, the proponent of the strike need only present race or gender neutral reasons." *State v. Casey*, 325 S.C. 447, 451–52, 481 S.E.2d 169, 171–72 (Ct.App.1997) (quoting *State v. Watts*, 320 S.C. 377, 380, 465 S.E.2d 359, 362 (Ct.App.1995)). "[A] 'legitimate reason' is not a reason that makes sense, but a reason that does not deny equal protection." *Purkett v. Elem*,

514 U.S. 765, 769, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995). The explanation "need not be persuasive, or even plausible, but it must be clear and reasonably specific such that the opponent of the challenge has a full and fair opportunity to demonstrate pretext in the reason given and the trial court to fulfill its duty to assess the plausibility of the reason in light of all the evidence with a bearing on it." *Giles,* 407 S.C. at 21–22, 754 S.E.2d at 265. "The burden of persuading the court that a *Batson* violation has occurred remains at all times on the opponent of the strike." *Evins,* 373 S.C. at 415, 645 S.E.2d at 909. The opponent of the strike is required show the race-neutral or gender-neutral explanation was mere pretext, which generally is established by showing the party did not strike a similarly-situated member of another race or gender. *Haigler,* 334 S.C. at 629, 515 S.E.2d at 91.

"Whether a *Batson* violation has occurred must be determined by examining the totality of the facts and circumstances in the record." *Edwards,* 384 S.C. at 509, 682 S.E.2d at 822. "Under some circumstances, the race-neutral explanation given by the proponent may be so fundamentally implausible that the [trial court] may determine . . . the explanation was mere pretext even without a showing of disparate treatment." *Haigler,* 334 S.C. at 629, 515 S.E.2d at 91 (quoting *Payton v. Kearse,* 329 S.C. 51, 55, 495 S.E.2d 205, 207 (1998)). "The trial [court's] findings of purposeful discrimination rest largely on [its] evaluation of demeanor and credibility." *Edwards,* 384 S.C. at 509, 682 S.E.2d at 823. "Often the demeanor of the challenged attorney will be the best and only evidence of discrimination, and an 'evaluation of the [attorney's] mind [based on demeanor and credibility] lies peculiarly within a trial [court's] province.'" *Id.* (quoting *Hernandez v. New York,* 500 U.S. 352, 365, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991)). The [trial court's] findings regarding purposeful discrimination are given great deference and will not be set aside by this court unless clearly erroneous. *Evins,* 373 S.C. at 416, 645 S.E.2d at 909–10. "This standard of review, however, is premised on the trial court following the mandated procedure for a *Batson* hearing." *State v. Cochran,* 369 S.C. 308, 312, 631 S.E.2d 294, 297 (Ct.App.2006). "[W]here the assignment of error is the failure to follow the *Batson* hearing procedure, we must answer a question of law. When a question of law is

presented, our standard of review is plenary." *Id.* at 312–13, 631 S.E.2d at 297.

"If a trial court improperly grants the State's *Batson* motion, but none of the disputed jurors serve on the jury, any error in improperly quashing the jury is harmless because a defendant is not entitled to the jury of her choice." *Edwards,* 384 S.C. at 509, 682 S.E.2d at 823 (citing *State v. Rayfield,* 369 S.C. 106, 114, 631 S.E.2d 244, 248 (2006)). "However, if one of the disputed jurors is seated on the jury, then the erroneous *Batson* ruling has tainted the jury and prejudice is presumed in such cases 'because there is no way to determine with any degree of certainty whether a defendant's right to a fair trial by an impartial jury was abridged.' " *Id.* (quoting *Rayfield,* 369 at 114, 631 S.E.2d at 248). If this occurs, the proper remedy in such cases is the granting of a new trial. *Id.*

During jury selection, Palmer exercised peremptory strikes on white and black jurors. He struck nine white jurors and two black jurors. The State requested a *Batson* hearing, asserting Palmer's strikes were not race neutral.

Palmer testified as to the following reasons for striking each white juror:

- Juror 46 had employment with Williamsburg County, and he strikes county employees when the Sheriff's Office makes a case for the county.
- Juror 178 was employed by the South Carolina Department of Natural Resources and potentially had a law enforcement connection and was sympathetic to law enforcement.
- Juror 31 was employed by the Department of Social Services (DSS) and anyone involved in DSS may potentially be sympathetic to law enforcement.
- Juror 97 was employed by the United States Postal Service, and based on his employment, he may have sympathies for law enforcement.
- Juror 136 was a Hemingway resident and worked for the steel company in the electrician field. Palmer explained there were technical issues involving Palmer's car, and the juror could sway other jurors based on his training.

- Juror 173 was a plant supervisor, and given his supervisory capacity, he was potentially unsympathetic to Palmer.
- Juror 7's daughter was involved in a criminal case as a victim or a witness.
- Juror 5's wife was a registered nurse in the operating room, and operating room nurses have relationships with law enforcement and are sympathetic with law enforcement.
- Juror 29 was a paramedic, and paramedics have a close relationship with law enforcement.

In response, the State asserted Palmer testified he struck white jurors because they were government employees. However, Palmer seated Juror 27, a black male, who was retired from the County Transit Authority and would be no different from Juror 97, who was also a government employee. Jurors 27, 61, and 87 were from Hemingway, and Palmer struck Juror 136 for being from Hemingway. Palmer also seated Juror 12, a black female, who worked at the Georgetown Hospital as a certified nursing assistant, and her brother was a witness in the case. The State asserted she was no different from Juror 29, who was a paramedic, and Juror 5, whose wife was a nurse. Therefore, the State argued some of the reasons advanced by Palmer were pretextual because he seated similarly-situated black jurors.

Palmer responded his concern with Juror 136 was more that he was a mechanic than that he was from Hemingway. As to the bus driver who was not struck, Palmer asserted she would not have similar leanings supporting law enforcement as the other government employees because they are employed within the government walls. The court stated it was not convinced the answers were race neutral; therefore, it granted the State's *Batson* motion and redrew the jury.

We acknowledge that Palmer's stated concerns that Jurors 46, 178, 31, and 97 were government employees who interacted regularly with law enforcement were race neutral reasons to strike. *Id.* at 510, 682 S.E.2d at 823 (stating petitioners' stated concern that juror 131 was a state employee who interacted regularly with law enforcement was a race neutral reason to strike). Palmer's concerns about Jurors 136, 173, and 29's jobs also were race-neutral reasons to strike. *Id.*

("Employment is a well-understood and recognized consideration in the exercise of peremptory challenges."); *State v. Ford*, 334 S.C. 59, 65, 512 S.E.2d 500, 504 (1999) (holding place of employment is a race-neutral reason for a strike); *State v. Adams*, 322 S.C. 114, 125, 470 S.E.2d 366, 372 (1996) (finding type of employment is a race-neutral reason for a strike). However, the State demonstrated the explanations were pretextual by showing Palmer did not strike similarly-situated members of another race. *See Haigler*, 334 S.C. at 629, 515 S.E.2d at 91 (providing an opponent of a strike must show the race or gender-neutral explanation was mere pretext, which generally is established by showing the party did not strike a similarly-situated member of another race or gender). Therefore, we find the trial court did not err in granting the State's *Batson* motion.

## II. Motions for Mistrial and New Trial

Palmer argues the trial court erred in denying his motion for a mistrial and a motion for a new trial. We disagree.

"The decision to grant or deny a mistrial is within the sound discretion of the trial court." *State v. Harris*, 382 S.C. 107, 117, 674 S.E.2d 532, 537 (Ct.App.2009). "The trial court's decision will not be overturned on appeal absent an abuse of discretion amounting to an error of law." *Id.* "A mistrial should only be granted when absolutely necessary, and a defendant must show both error and resulting prejudice in order to be entitled to a mistrial." *Id.* "The granting of a motion for a mistrial is an extreme measure that should only be taken if an incident is so grievous that the prejudicial effect can be removed in no other way." *Id.* The defendant must show error and resulting prejudice to receive a mistrial. *State v. Council*, 335 S.C. 1, 13, 515 S.E.2d 508, 514 (1999), *cert. denied*, 528 U.S. 1050, 120 S.Ct. 588, 145 L.Ed.2d 489 (1999).

During trial, a witness was asked if he took a polygraph test. Palmer objected to the question, and the court overruled the objection. Palmer moved for a mistrial based upon the introduction of the fact that the witness took a polygraph test. The State responded that the reference to the polygraph was from a witness and not Palmer; thus, the motion for mistrial

was improper and the witness' testimony that he took a polygraph test was relevant evidence. The court denied the motion for mistrial.

■■■■ After the jury reached its verdict, Palmer moved for a new trial based upon the admission of the fact that the witness took a polygraph test. Palmer asserted the jury could infer the witness passed the polygraph and was no longer a suspect, and Palmer did not take a polygraph test because he could not pass one. He also asserted it was improper burden shifting. The State again asserted the reference to the polygraph was from a witness and not Palmer. The court denied Palmer's motion for a new trial:

> I find that it certainly appeared that he received a fair trial. I am going to deny your motion for a new trial and I don't believe that, by the witness concerning the polygraph and quite frankly I think that was one of your weaknesses that was called at that time. I am going to deny. . . .

Before our supreme court's decision in *Council,* the law of South Carolina was that evidence of polygraph examinations was generally inadmissible. *See State v. Johnson,* 334 S.C. 78, 90, 512 S.E.2d 795, 801 (1999) ("Evidence regarding the results of a polygraph test or the defendant's willingness or refusal to submit to one is inadmissible."); *State v. Wright,* 322 S.C. 253, 255, 471 S.E.2d 700, 701 (1996) ("Generally, the results of polygraph examinations are inadmissible because the reliability of the polygraph is questionable."). "Although [the court] in *Council* declined to recognize a *per se* rule against the admission of polygraph evidence, it indicated that the 'admissibility of this type of scientific evidence should be analyzed under Rules 702 and 403, SCRE and the [*State v. Jones,* 273 S.C. 723, 259 S.E.2d 120 (1979) ] factors.'" *Lorenzen v. State,* 376 S.C. 521, 533, 657 S.E.2d 771, 778 (2008) (quoting *Council,* 335 S.C. at 24, 515 S.E.2d at 520). Rule 403, SCRE, provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." "The general rule is that no mention of a polygraph test should be placed before the jury. It is thus incumbent upon the trial

[court] to ensure that should such a reference be made, no improper inference be drawn therefrom." *State v. Johnson*, 376 S.C. 8, 11, 654 S.E.2d 835, 836 (2007).

The State argues the question was intended solely to show the witness had cooperated with law enforcement during the investigation. The State asserts that no mention of the results of the polygraph were made and there was no mention of whether Palmer took or was offered a polygraph test. The State asserts Palmer suffered no prejudice from the evidence even if the trial court erred in allowing the question because the results of the witness' polygraph were not discussed at trial.

Furthermore, the one question during the witness' cross-examination was the only reference to a polygraph during Palmer's trial.

To receive a mistrial, Palmer was required to show error and resulting prejudice. *See Council*, 335 S.C. at 13, 515 S.E.2d at 514. We find the trial court's decision not to grant a mistrial is supported by the evidence. First, the evidence admitted was simply that the witness took a polygraph test. The results of this test were not indicated at trial and are not mentioned anywhere in the record. While the jury could have inferred, as claimed by Palmer, that the witness passed the polygraph test and was no longer a suspect, and Palmer did not take a polygraph test because he could not pass one, an equally plausible inference is that Palmer was not asked to take a polygraph because there was no mention of Palmer being asked to take one. Because there was no evidence regarding the results of the witness' polygraph test, Palmer failed to meet his burden of establishing the prejudicial impact of this evidence. Further, the one reference to the witness taking a polygraph test was an isolated comment. Therefore, we find the trial court did not err in denying his motions.

### III. Speedy Trial

Palmer argues the trial court erred in denying his motion for a speedy trial. We disagree.

A criminal defendant is guaranteed the right to a speedy trial. U.S. Const. amend. VI; S.C. Const. art. I, § 14. "This right 'is designed to minimize the possibility of lengthy

incarceration prior to trial, to reduce the lesser, but nevertheless substantial, impairment of liberty imposed on an accused while released on bail, and to shorten the disruption of life caused by arrest and the presence of unresolved criminal charges.'" *State v. Pittman*, 373 S.C. 527, 548–49, 647 S.E.2d 144, 155 (2007) (quoting *United States v. MacDonald*, 456 U.S. 1, 8, 102 S.Ct. 1497, 71 L.Ed.2d 696 (1982)). A "'speedy trial does not mean an immediate one; it does not imply undue haste, for the [S]tate, too, is entitled to a reasonable time in which to prepare its case; it simply means a trial without unreasonable and unnecessary delay.'" *State v. Langford*, 400 S.C. 421, 441, 735 S.E.2d 471, 481–82 (2012) (quoting *Wheeler v. State*, 247 S.C. 393, 400, 147 S.E.2d 627, 630 (1966)). "There is no universal test to determine whether a defendant's right to a speedy trial has been violated." *Evans*, 386 S.C. at 423, 688 S.E.2d at 586.

When determining whether a defendant has been deprived of his or her right to a speedy trial, this court should consider four factors: (1) length of the delay; (2) reason for the delay; (3) defendant's assertion of the right; and (4) prejudice to the defendant. *State v. Brazell*, 325 S.C. 65, 75, 480 S.E.2d 64, 70 (1997) (citing *Barker v. Wingo*, 407 U.S. 514, 530, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972)). These four factors are related and must be considered together with any other relevant circumstances. *Barker*, 407 U.S. at 533, 92 S.Ct. 2182. "Accordingly, the determination that a defendant has been deprived of this right is not based on the passage of a specific period of time, but instead is analyzed in terms of the circumstances of each case, balancing the conduct of the prosecution and the defense." *Pittman*, 373 S.C. at 549, 647 S.E.2d at 155. However, in *Doggett v. United States*, 505 U.S. 647, 652 n. 1, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992), the United States Supreme Court suggested in dicta that a delay of more than a year is "presumptively prejudicial." Also, in *State v. Waites*, 270 S.C. 104, 108, 240 S.E.2d 651, 653 (1978), our supreme court found a two-year-and-four-month delay was sufficient to trigger further review. "[A] delay may be so lengthy as to require a finding of presumptive prejudice, and thus trigger the analysis of the other factors." *Pittman*, 373 S.C. at 549, 647 S.E.2d at 155.

In *State v. Evans*, 386 S.C. 418, 424–26, 688 S.E.2d 583, 586–87 (App.2009), this court found a twelve-year delay in bringing a case to trial did not violate the defendant's speedy trial right when the defendant's statement to police was suppressed; the appeals of the suppression order lasted five years; after the appeals, the case was transferred to an assistant solicitor and the solicitor was later elected solicitor of another circuit; and the defendant failed to establish she was prejudiced by the delay. In *State v. Cooper*, 386 S.C. 210, 217–18, 687 S.E.2d 62, 67 (Ct.App.2009), this court held a delay of forty-four months did not violate the defendant's constitutional right to a speedy trial even though the delay was to some degree the result of prosecutorial and governmental negligence because any presumption of prejudice was persuasively rebutted when the State withdrew its notice to seek the death penalty. Thus, the court found the withdrawal could be construed as a benefit to the defendant resulting from the delay. *Id.*

Palmer responded to a warrant for his arrest by turning himself in to law enforcement on November 15, 2010. Palmer made a timely motion for a speedy trial on March 24, 2011, and renewed his motion on March 26, 2012, along with a motion to dismiss. Palmer was represented initially by Legrand Carraway of the Williamsburg County Public Defender's Office. Carraway was relieved as counsel, and W. James Hoffmeyer was later appointed. He was subsequently relieved as counsel, and William J. Barr was appointed on December 15, 2011. Barr was relieved as counsel on August 24, 2012, and E. Guy Ballenger was appointed on August 16, 2012. Ballenger was Palmer's counsel at the trial on March 11–14, 2013.

On March 5, 2013, Palmer filed a motion in limine. In his motion, he renewed his motion for a speedy trial and requested that his charges be dismissed. The motion was heard by the court after jury selection. The State argued that Carraway had previously represented the victim on an unrelated charge, and Palmer requested new counsel. Palmer also requested that Hoffmeyer file a motion to be relieved as counsel after his bond hearing. Palmer also consented to Barr's motion to be relieved as counsel. Therefore, the State asserted "it's not proper for him now to say because I fired all

of these lawyers and my court is two years after I was arrested I'm now somehow prejudiced based on my own conduct."

The court denied his motion, stating:

Alright based upon the criteria. It is two years out[.] I've seen longer and again the [sic] apparently a highly[-]technical case[.] [W]e've got over thirty something witnesses named in this. One of the reason [sic] obviously it appears to be at least Mr. Palmer being unsatisfied with his attorneys[.] I think he's now got a great attorney. You've tried cases in front of me before and been very successful. I understand that he has asserted this right at [a] point in time as he should have[,] but I don't find where he's [sic] could be unfairly prejudice[d] in this matter[,] and I'm going to deny your motion.

Palmer argues on appeal that the delay was not his fault. He asserts there is no evidence that any of his attorneys requested a continuance or indicated they needed time to prepare for the case. He argues the delay was caused by the State's failure to schedule the case for trial. He also argues he was prejudiced by the delay because he was incarcerated from his arrest until his trial, which hindered his ability to gather evidence, contact witnesses, or otherwise prepare his defense. Furthermore, there was no direct physical evidence linking Palmer to the murder, and Smith and Croskey were inconsistent in their testimony and statements. Finally, he was prejudiced by the death of a witness and the lack of memory by another witness.

Palmer's trial was held just shy of two years from the date of his first motion for a speedy trial. We find this delay was sufficient to trigger further review of his right to speedy trial, and he asserted his right three times. *See Waites*, 270 S.C. at 108, 240 S.E.2d at 653 (determining a two-year-and-four-month delay was sufficient to trigger further review). As for the reason for the delay, at the July 21, 2011 hearing, the solicitor noted Palmer's case would not be able to be tried until Spring 2012 because of other matters already scheduled. An additional reason for the delay was due to Palmer having four attorneys prior to trial. *See State v. Kennedy*, 339 S.C. 243, 250, 528 S.E.2d 700, 704 (Ct.App.2000) (finding no viola-

tion of the defendant's right to a speedy trial, even though the delay was two years and two months, when the case was clearly complicated and required substantial time to investigate and prepare and there was no evidence the State purposefully delayed the trial); *State v. Smith*, 307 S.C. 376, 380, 415 S.E.2d 409, 411 (Ct.App.1992) (holding the burden was on the defendant to show the delay was due to the neglect and willfulness of the State's prosecution). As for prejudice to Palmer, he contended he was prejudiced because his case hinged on eyewitness testimony, and they may have difficulty in recalling. Palmer was able to challenge some witness' credibility by using their prior statements. *See Brazell*, 325 S.C. at 76, 480 S.E.2d at 70–71 (noting the three-year-and-five-month delay was negated by the lack of prejudice to the defense); *Kennedy*, 339 S.C. at 251, 528 S.E.2d at 704 ("While Kennedy may have been slightly prejudiced by the twenty-six month pretrial incarceration, the more important question is whether he was prejudiced because the delay impaired his defense."); *Langford*, 400 S.C. at 445, 735 S.E.2d at 484 (finding a two-year delay in bringing the case to trial did not amount to a constitutional violation in the absence of any actual prejudice to the defendant's case). Furthermore, the death of the one witness was not raised at trial; therefore, it is not preserved. Accordingly, we find the trial court properly weighed the four *Barker* factors, and the evidence supported its decision.

## IV. Statement to Law Enforcement

 Palmer argues the trial court erred in admitting his statement to law enforcement after he invoked his right to counsel. We disagree.

 "A waiver of *Miranda* rights is determined from the totality of the circumstances." *State v. Kennedy*, 333 S.C. 426, 429, 510 S.E.2d 714, 715 (1998). "On appeal, the conclusion of the trial [court] on issues of fact as to the voluntariness of a statement will not be disturbed unless so manifestly erroneous as to show an abuse of discretion." *Id.* "Statements elicited during interrogation are admissible if the prosecution can establish that the suspect 'knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel.'" *Id.* (quoting *Miranda v.*

*Arizona,* 384 U.S. 436, 475, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)).

At trial, Palmer moved to suppress his statement given to law enforcement on October 29, 2010. Officer Creech read Palmer his *Miranda* warnings, and Palmer said he would talk to the officers. The transcript of the conversation states in pertinent part:

Creech: Do you wish to talk to us?

Palmer: I wish to talk to you, but I need for you to call Charles Barr too.

Creech: You want him here?

Palmer: I want him to come, yes.

Creech: Before you talk with us?

Palmer: I'll talk to you.

Creech: That's what I'm asking.

Palmer: Okay, w[hat d]o you want to know?

Creech: Are you willing to talk to us?

Palmer: Yes.

Creech: Do you understand your rights and do you understand what your rights are, and you want to talk to us? You want to talk to us without a lawyer present?

Palmer: Yes.

Creech: You understand and know what you're doing, and we haven't promised you anything or threatened you in any[ ]way.

Palmer: No.

Creech: And no pressure or coercion of any kind has been used against you by anyone?

Palmer: No.

Palmer then signed the waiver of rights form. After Palmer gave his statement, he told Creech he was not going to say anything else, and he wanted to talk to a lawyer. Creech then ended the interview. Palmer stated he wanted to talk to a lawyer when Creech asked him if he would take a polygraph exam. Creech said Palmer was not under arrest at the time.

Palmer testified he was told he was under arrest by Investigator Deborah Collins, but when he arrived at the sheriff's office, he was told he was not under arrest. He testified he

kept asking for Barr, and his mother told him to speak to him before he talked to anyone. Palmer said Investigator Collins took his cell phone so he could not call Barr himself, and she took his driver's license so he could not leave. He said he told the police he would talk to them without his lawyer present because he was scared and had never been through anything like it before. He admitted he had been arrested three times prior for simple possession of marijuana, but he had never been subjected to interrogation. Palmer testified Creech told him before they gave him the waiver that he would not really be waiving his right. On cross-examination, Palmer acknowledged he understood the *Miranda* warnings, and he could have stopped talking to the officers at any time. Palmer argued his statement should be suppressed under *State v. Wannamaker*, 346 S.C. 495, 552 S.E.2d 284 (2001), which reaffirms that if a suspect invokes her right to counsel, the police interrogation must cease unless the suspect herself initiates further communication with police. The court denied the motion to suppress admission of Palmer's statement. Palmer renewed his motion when the audio recording was introduced at trial, and the court overruled the objection. He again renewed the motion after the jury verdict.

On appeal, Palmer argues his request for counsel was sufficiently clear that a reasonable police officer in the circumstances would understand the statement was a request for an attorney. Palmer asserts the officers were required to cease questioning unless an attorney was present.

In *Davis v. United States*, 512 U.S. 452, 461, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994), the Supreme Court of the United States held that, "after a knowing and voluntary waiver of the *Miranda* rights, law enforcement officers may continue questioning until and unless the suspect clearly requests an attorney." "Of course, when a suspect makes an ambiguous or equivocal statement it will often be good police practice for the interviewing officers to clarify whether or not he actually wants an attorney." *Id.*

Here, Palmer stated he would talk to the officers, but he also wanted his attorney. Because Palmer did not unambiguously invoke his right to counsel, the officers were allowed to ask a few questions for clarification. Palmer indicated he

wanted to continue talking to the officers after being advised of his *Miranda* rights, and he voluntarily waived his rights before his statement was taken. Therefore, we find the trial court correctly denied the motion to suppress Palmer's statement.

## V. Sentencing

Palmer argues the trial court erred in sentencing him on a possession of a weapon during the commission of a violent crime conviction after sentencing him to life imprisonment without parole for murder. We agree.

Palmer was found guilty of murder and possession of a weapon during the commission of a violent crime. The court sentenced Palmer to five years' imprisonment on the possession of a weapon during the commission of a violent crime after sentencing him to life without parole on the murder. Palmer objected to the sentence. Palmer argues this was in error because S.C.Code Ann. § 16–23–490(A) (2015) provides the five-year sentence is inapplicable when a court imposes a life without parole sentence.

The State concedes this was in error, and we agree. Therefore, Palmer's sentence for possession of a weapon during the commission of a violent crime should be vacated. *See State v. Owens*, 346 S.C. 637, 666, 552 S.E.2d 745, 760 (2001), *overruled on other grounds by State v. Gentry*, 363 S.C. 93, 610 S.E.2d 494 (2005).

## CONCLUSION

Accordingly, we affirm Palmer's convictions for murder and possession of a weapon during the commission of a violent crime and vacate his sentence for possession of a weapon during the commission of a violent crime.

**AFFIRMED and VACATED IN PART.**

GEATHERS and McDONALD, JJ., concur.