# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

The State, Respondent,

v.

JeJauncey Fernando Harrington, Appellant.

Appellate Case No. 2023-000305

———————

Appeal From Marlboro County
Michael G. Nettles, Circuit Court Judge

———————

Opinion No. 6132
Heard October 16, 2025 – Filed January 21, 2026

———————

## AFFIRMED IN PART, VACATED IN PART

———————

Senior Appellate Defender Lara Mary Caudy, of Columbia, for Appellant.

Attorney General Alan McCrory Wilson, Deputy Attorney General Donald J. Zelenka, Senior Assistant Deputy Attorney General Melody Jane Brown, and Senior Assistant Attorney General J. Anthony Mabry, all of Columbia; and Solicitor Paul Michael Burch, Jr., of Chesterfield, all for Respondent.

———————

**GEATHERS, J.:** Appellant JeJauncey Harrington appeals his convictions for two counts of murder, kidnapping, armed robbery, use of a motor vehicle without the owner's consent, and possession of a weapon during the commission of a violent crime. Harrington argues the trial court erred by denying his motion to suppress his DNA profile and by admitting expert testimony on footwear impressions.

Harrington also argues the trial court violated section 16-23-490(A) of the South Carolina Code (2015) by sentencing him to five years for possession of a weapon during the commission of a violent crime because he was sentenced to life without parole for murder. We affirm the trial court's denial of the motion to suppress DNA evidence and admission of the expert testimony; however, we vacate the five-year sentence for the weapon conviction.

## FACTS AND PROCEDURAL HISTORY

This case began with the tragic murder of Ella Lowery and the kidnapping and murder of her eight-year-old daughter (Child). In 2017, Ella and her two children lived with Ella's mother, Delores Lowery. Delores, who worked at night, left Ella and the children at home around 11:30 p.m. on May 4, 2017, and returned shortly before 8:30 a.m. the next morning. As she was walking inside, she noticed a cigarette butt on the top step leading to the door, which struck her as unusual because no one in her family smoked and she did not allow smoking in or around her home. When she entered the kitchen, she found Ella lying face down in a puddle of blood. Hearing Delores screaming, Ella's ten-year-old son ran out of his bedroom, but Delores could not find Child.

Delores called 911, and the Marlboro County Sheriff's Office (MCSO) responded. After confirming that Child did not get on the school bus on the morning of May 5, the search for her began. MCSO requested assistance from the South Carolina Law Enforcement Division (SLED) and the FBI. Law enforcement collected evidence from the scene, which included the cigarette butt Delores noticed on the steps and cuttings from the linoleum floor in the kitchen that contained shoe impressions; they also took photographs of a footprint made in suspected blood under the carport.

On May 7, FBI agents interviewed Jamie Campbell, a close friend of Ella's. Among other questions, the agents asked Campbell if she recognized a phone number that appeared on Ella's phone records because Ella's phone received several text messages from this number in the hours before her death and the number was also the recipient of Ella's last outgoing text. Cell site location information (CSLI) from this number also placed the associated cell phone in the area around Ella's home in the early hours of the morning of her death. Campbell identified the number as Harrington's.

Meanwhile, Adrienne Hefney, a DNA analyst at SLED, developed a DNA profile from the cigarette butt but was unable to identify the profile. Hefney told

Lieutenant Roxanne Love, the SLED agent supervising the investigation, to notify her of any persons of interest so she could look in SLED's databases for a profile that matched the cigarette butt. On May 8, Love mentioned Harrington's name to Hefney because Harrington had become a suspect when Campbell provided his name to the FBI. Hefney found Harrington's DNA profile in a SLED database and matched it to the profile from the cigarette butt. Hefney then told Love she needed a known DNA standard[1] from Harrington to compare to the cigarette butt and that a known standard existed as an exhibit maintained by MCSO from a prior murder case.[2]

Love reached out to Sandy Wilkes, the MCSO evidence custodian, and asked about evidence related to the 2005 murder investigation. Wilkes located the evidence in storage, and Love obtained Harrington's known blood standard from the evidence. The known standard was delivered to Hefney on May 9. Hefney developed a DNA profile from the known standard and determined it matched the DNA profile from the cigarette butt.

Separately, on May 9, MCSO obtained an arrest warrant for Harrington for the use of a vehicle without the owner's consent after Campbell told the FBI the registration and insurance for the 1998 Mitsubishi Eclipse Harrington had been driving were in her name and Harrington did not have permission to drive it. Harrington was arrested two days later, on May 11, in Charlotte, North Carolina, after a license plate reader alerted the Charlotte-Mecklenburg Police Department (CMPD) of the whereabouts of the vehicle. Following his arrest, Harrington voluntarily consented to the taking of a buccal swab and signed a voluntary consent to search form.

CMPD towed the Eclipse to a secure location, and SLED investigators processed it after obtaining a search warrant. Swabs were taken from the lock mechanism on the interior latch of the trunk, the bottom of the trunk, and the floorboard of the passenger seat and analyzed for DNA. SLED developed a DNA

---

[1] A known standard is a DNA sample (e.g., a blood sample or buccal swab) collected from a person by consent or pursuant to a court order for evidence comparison purposes as opposed to one collected for databasing purposes. While a match to a database profile may provide an investigative lead, a match to a known standard is required for DNA evidence to be admissible in court.

[2] Harrington was charged with murder in the prior case in 2005, but a jury acquitted him of the charge in 2007.

profile from the trunk latch that matched Child's DNA profile. Investigators also found Harrington's DNA in several places inside the car. Harrington was charged with Ella's murder on May 12, 2017.[3]

At that point, Child had not been found. On May 13, Richard LaBean, a Marlboro County resident who knew Harrington, learned that Harrington had been arrested and charged with Ella's murder. Harrington grew up in a house across from LaBean's house that had since been abandoned. LaBean had seen Harrington at the abandoned house once or twice, so he decided to check his personal surveillance cameras for footage from the morning of Ella's death. The footage showed a car arriving at the property shortly after midnight and driving to the back of the abandoned house, and about two hours later, a car leaving the abandoned house with its lights off. LaBean called 911, and investigators responded to confirm what the footage showed.

Based on this footage investigators obtained a warrant and searched the property, including the abandoned house. On the morning of May 14, investigators found Ella's debit card and a receipt with her name on it on the ground near the abandoned house. Shortly after, investigators found the body of a small female child in a nearby swamp, later determined to be Child. Harrington was subsequently charged with Child's kidnapping and murder. On May 31, 2017, the State moved for a *Schmerber*[4] order to obtain an additional sample of Harrington's DNA, which the trial court granted.

A grand jury indicted Harrington on September 12, 2017, for two counts of murder as well as kidnapping, armed robbery, use of a motor vehicle without the owner's consent, and possession of a weapon during the commission of a violent crime. During pretrial hearings, Harrington moved to suppress DNA evidence and to exclude expert testimony from SLED expert Melinda Worley regarding footwear impressions. The trial court deferred ruling on the motions but ultimately denied both.[5]

---

[3] A clear motive has never been established.

[4] A *Schmerber* order refers to a court order that permits the government to conduct a search that involves a bodily intrusion such as the collection of a buccal swab. *See Schmerber v. California*, 384 U.S. 757 (1966).

[5] As to Worley's testimony, the trial court found her qualified to testify as an expert but reserved the decision on whether her testimony was admissible.

The case proceeded to a bench trial on February 9, 2023, after Harrington agreed to waive his right to a jury trial and the State agreed to withdraw its notice of intent to seek the death penalty. Relevant to this appeal, the State presented evidence that Harrington's DNA profile matched the DNA profile developed from the cigarette butt found at the crime scene. The State did not present the initial match between the 2005 known blood standard and the cigarette butt as evidence at trial. Rather, it presented as evidence the match between the cigarette butt and the DNA profiles developed from the voluntary buccal swab and the *Schmerber* swab.

Additionally, the State proffered Worley as an expert in the field of outer sole footwear impression comparison analysis. After hearing her proposed testimony in camera, the trial court found her testimony to be admissible. Worley testified she followed the ACE-V[6] procedure to compare known shoe impressions with the impressions found at the crime scene. This process involved creating inked impressions of two known shoes—size 12 Nike Air Force 1s[7] belonging to a former suspect in this case and Harrington's size 13 Nike Air Force 1s, which he was wearing when he was arrested in Charlotte—and comparing them to photographs of the impression found under the carport and cuttings of the kitchen linoleum that contained impressions. When asked, in her expert opinion, what size shoe made the unknown impressions, she responded "Some of them[;] I couldn't tell a difference between the 12 and the 13. I couldn't rule one out; so I included both of them. And others I determined that they were corresponding in combined class characteristics of the size 13 shoe more so than the size 12."

At the conclusion of the trial, the trial court convicted Harrington as indicted and sentenced him to life imprisonment for each count of murder, thirty years for kidnapping, thirty years for armed robbery, five years for use of a motor vehicle without owner's consent, and five years for the weapon offense, all set to run concurrently. This appeal followed.

---

[6] ACE-V is an acronym used by forensic footwear analysis that stands for Analysis, Comparison, Evaluation, and Verification.

[7] Early in the investigation, police arrested Ella's former boyfriend, who had an altercation with Ella the night of May 3 into the early morning of May 4 and who had been wearing these size 12 Air Force 1s at the time. He was eventually released because Ella was still alive on the evening of May 4 and because phone records and local surveillance revealed he was not near Ella's home when she died.

## ISSUES ON APPEAL

I.  Whether the trial court erred by denying Harrington's motion to suppress his DNA profile developed in part from a known blood standard obtained during an unrelated murder investigation for which Harrington was charged in 2005 and acquitted by a jury in 2007.

II.  Whether the trial court erred by admitting expert testimony on footwear impression analysis under Rule 702, SCRE, and Rule 403, SCRE.

III.  Whether the trial court erred by sentencing Harrington to five years for possession of a weapon during the commission of a violent crime when he was sentenced to life without parole for murder in violation of section 16-23-490(A).

## LAW AND ANALYSIS

### I.  DNA Profile

Harrington argues MCSO violated section 17-1-40 of the South Carolina Code (Supp. 2025) because it failed to destroy his known blood standard after he was acquitted of a murder charge in 2007.  According to Harrington, the trial court erred by denying his motion to suppress DNA evidence because the DNA profile developed from this known blood standard tainted the investigation.  We disagree.

Initially, we question whether section 17-1-40, as it existed at the time of Harrington's acquittal, required destruction of the known blood standard.  But even if it did, law enforcement independently obtained a DNA profile for Harrington, first from a sample he voluntarily provided after being arrested for use of a motor vehicle without the owner's consent and then from a sample collected pursuant to a *Schmerber* hearing.  Harrington does not challenge the taking of either of these samples on appeal.  Thus, even if the known blood standard was retained in violation of section 17-1-40, we hold the trial court did not err by denying Harrington's motion to suppress DNA evidence under the independent source exception.  *See State v. Moore*, 429 S.C. 465, 479, 839 S.E.2d 882, 889 (2020) ("[E]vidence is admissible if it was obtained from a lawful source independent of [any] illegal conduct. (quoting *State v. Copeland*, 321 S.C. 318, 323, 468 S.E.2d 620, 624 (1996))).

### A. Standard of Review

In evaluating the trial court's ruling on a motion to suppress, this court reviews the factual findings for any evidentiary support, "but the ultimate legal conclusion . . . is a question of law subject to de novo review." *State v. Frasier*, 437 S.C. 625, 633–34, 879 S.E.2d 762, 766 (2022).

## B. Section 17-1-40 of the South Carolina Code

In 2007, when Harrington was acquitted by a jury of a murder charge, section 17-1-40 stated as follows:

> Any person who after being charged with a criminal offense . . . is found to be innocent of such charge[,] the arrest and booking record, files, mug shots, and fingerprints of such person shall be destroyed[,] and no evidence of such record pertaining to such charge shall be retained by any municipal, county[,] or [s]tate law enforcement agency.

S.C. Code Ann. § 17-1-40 (2007) (amended 2016). Harrington argues that a known blood standard is equivalent to a mugshot or fingerprint card, and therefore under the statute, MCSO should have destroyed the known blood standard it obtained from Harrington during the 2005 murder investigation after he was acquitted of this charge. We disagree.

A DNA sample collected for evidentiary or investigative purposes differs from a DNA sample collected for identification or databasing purposes. *See* Ming W. Chin, et al., *Forensic DNA Evidence: Science and the Law* § 3:2 (2025) ("Even if probable cause exists to arrest a subject, a DNA reference sample for case investigation purposes—as distinguished from mandatory DNA samples for DNA database purposes—should be obtained pursuant to warrant or valid consent, as is consistent with Fourth Amendment principles."). The distinction derives from the function of the sample rather than the method of collection.[8]

---

[8] We do note, however, that DNA collection kits provided by SLED for the taking of database samples differ from collection kits provided for the taking of samples pursuant to consent or court order. According to SLED's guidelines, DNA database collection kits, which are processed by the DNA Database Department, can only be used to collect DNA samples for entry into the state DNA database under section 23-3-620 of the South Carolina Code (2025). S.C. State L. Enf't Div., *DNA Database FAQs*, https://www.sled.sc.gov/forms/forensics/DNAdatabase/FAQs_

In South Carolina, section 23-3-620 of the State Deoxyribonucleic Acid Identification Record Database Act (DNA Database Act) requires the collection of a DNA sample for inclusion in the state DNA database following a lawful custodial arrest for a felony. *See* S.C. Code Ann. § 23-3-620 (2025); *cf. Maryland v. King*, 569 U.S. 435, 449–56 (2013) (holding it is reasonable under the Fourth Amendment to collect and analyze arrestees' DNA to "process and identify" them following an arrest for a serious offense). However, these samples may be used *only* for databasing purposes. *See* S.C. State L. Enf't Div., *DNA Database*, https://www.sled.sc.gov/DNAdatabase. A DNA profile developed from a database sample is not considered evidence itself, and while a match between crime scene evidence and a database profile can provide an investigative lead, a direct comparison cannot be performed between an evidence profile and a database profile. *Id.* Instead, an evidence profile can only be directly compared to a *known standard* collected pursuant to consent or court order and in accordance with statutory and constitutional guidelines. *See id.*; *State v. Baccus*, 367 S.C. 41, 53–55, 625 S.E.2d 222–23 (2006) (noting that in the absence of consent, a blood sample may only be procured pursuant to a search warrant or court order and a finding of probable cause); *State v. Chisholm*, 395 S.C. 259, 267, 717 S.E.2d 614, 618 (Ct. App. 2011) ("Considerations for determining whether or not there exists probable cause to permit the acquisition of [DNA] evidence include the following elements: (1) probable cause to believe the suspect has committed the crime; (2) a clear indication that relevant material evidence will be found; and (3) the method used to secure it is safe and reliable."); Chin et al., *Forensic DNA Evidence: Science and the Law* § 3:2 ("Should investigators desire a DNA sample from an arrestee for direct comparison to crime scene evidence in that case or an unrelated case, ordinary principles governing searches apply. Most often a sample will be obtained by search warrant or consent.").

When Harrington was arrested and charged in 2005 and then acquitted in 2007, the DNA Database Act permitted DNA samples to be taken for databasing purposes only after a conviction. S.C. Code Ann. § 23-3-620 (2007) (amended 2008). The legislature did not amend the statute to require database samples to be taken following lawful custodial arrests until 2008. Act No. 413, 2008 S.C. Acts 4037, 4055. Notably, this means the blood standard in MCSO's possession must have been a sample taken pursuant to consent or court order for evidence comparison

Document.pdf. Alternatively, investigators must use suspect collection kits, which are provided by SLED's Evidence Control Department and processed by the DNA Casework Department, when a sample is taken by consent or following a court order. *Id.*

purposes and *not* a database sample taken upon Harrington's arrest. With this context in mind, we hold that the known blood standard in this case does not fall within the purview of section 17-1-40 because it was not collected for identification purposes as part of a standard booking procedure. *See King*, 569 U.S. at 465–66 ("When officers make an arrest supported by probable cause to hold for a serious offense and they bring the suspect to the station to be detained in custody, taking and analyzing a cheek swab of the arrestee's DNA is, like fingerprinting and photographing, a legitimate police booking procedure that is reasonable under the Fourth Amendment.").[9] Thus, law enforcement did not violate section 17-1-40 by retaining Harrington's known blood standard following his acquittal in 2007, and the trial court did not err by failing to suppress Harrington's DNA profile for this reason.[10] *Cf. State v. Glynn*, 166 P.3d 1075, 1083 (Kan. Ct. App. 2007) ("[A]ll the authorities we have located conclude that once law enforcement has lawfully obtained a blood sample and DNA therefrom, a defendant has no additional constitutional protected

---

[9] This reasoning, of course, implies that a database sample collected as part of the standard booking procedure would fall within the "arrest and booking record, files, mug shots, and fingerprints" contemplated by section 17-1-40. The DNA Database Act requires these samples to be "submitted to SLED as directed by SLED." § 23-3-620(A). Additionally, the DNA Database Act requires SLED to expunge a person's DNA database record and profile—including the underlying sample—upon request if the person has been found not guilty and follows the proper procedure. *Id.* S.C. Code Ann. § 23-3-660 (2025); *see also* S.C. Code Ann. § 23-3-615(A) (2025). Further, the session law that authorized the collection of database samples following custodial arrests required any law enforcement agency with a database sample in its possession to immediately destroy and dispose of the sample in accordance with section 23-3-640 of the South Carolina Code (2025). Act No. 413, 2008 S.C. Acts 4037, 4055. Thus, the retention by county law enforcement of a database sample collected incident to an arrest could violate sections 23-3-620 and 23-3-640, not section 17-1-40.

[10] While not the question presented to this court, we note an absence of clear statutory authority requiring law enforcement to destroy known blood standards following acquittals. Presumably, though the expungement process outlined in section 23-3-660 sits within the DNA Database Act, the spirit of this law—which requires SLED to destroy a person's database sample when it expunges their database record and profile—would also require SLED to destroy any known standards in its possession as part of the expungement process. However, it is less clear whether this expungement process would extend to the law enforcement agency that collected the known standard to the extent it remained in that agency's possession.

privacy in that evidence and it may be used in the investigation of other crimes for identification purposes without the necessity of a separate warrant.").

## C. Independent Source

Even if MCSO violated section 17-1-40 by failing to destroy Harrington's known blood standard, the trial court nevertheless did not err by denying Harrington's motion to suppress DNA evidence because law enforcement obtained his DNA profile from a lawful independent source.

Under the independent source exception to the exclusionary rule,

> [E]vidence must be excluded if it would not have come to light but for the illegal actions of the police, and the evidence has been obtained by the exploitation of that illegality. However, the challenged evidence is admissible if it was obtained from a lawful source independent of the illegal conduct.

*Moore*, 429 S.C. at 478–79, 839 S.E.2d at 889 (quoting *Copeland*, 321 S.C. at 323, 468 S.E.2d at 624); *see also Nix v. Williams*, 467 U.S. 431, 443 (1984) ("The independent source doctrine allows admission of evidence that has been discovered by means wholly independent of any constitutional violation.").

Harrington argues all DNA evidence must be suppressed because the investigation relied on a match between the DNA profile from the cigarette butt and Harrington's DNA profile from a known blood standard retained illegally, and that this match tainted the investigation. We disagree.

On May 7, 2017, Campbell identified the last phone number to contact Ella as belonging to Harrington, making him a person of interest in the case. SLED retrieved his known blood standard from MCSO to compare to the cigarette butt on May 9. Also on May 9, MCSO obtained an arrest warrant for Harrington for use of a vehicle without the owner's consent; this arrest warrant had nothing to do with any of the DNA evidence and rather was based on information Campbell provided to FBI agents. CMPD arrested Harrington on May 11, and he did not challenge this arrest.

Harrington consented to a buccal swab after this arrest. Later, the State requested a DNA sample pursuant to court order "out of an abundance of caution."

The trial court granted the State's motion to obtain an additional buccal swab to "make sure we have a swab that's taken with no controversy." On appeal, Harrington challenges neither the voluntariness of the initial swab nor the validity of the second.

We hold the investigative trail described above—which began with Campbell's interview, led to Harrington's arrest, and resulted in two uncontested buccal swabs—remains untainted by the testing of the known blood standard from the 2005 case. Even if that sample never existed, MCSO would still have obtained the arrest warrant for use of a vehicle without the owner's consent, and the remainder of the investigation—which included the independent collection of two uncontested DNA samples—would have unfolded in the same manner. In other words, even if Harrington's known blood standard from the 2005 case was illegally retained and tested, Harrington's DNA profile was "obtained from a lawful source independent of [any] illegal conduct" and was therefore admissible. *See Moore*, 429 S.C. at 479, 839 S.E.2d at 889 (quoting *Copeland*, 321 S.C. at 323, 468 S.E.2d at 624); *cf. State v. Patterson*, 425 S.C. 500, 508–09, 823 S.E.2d 217, 222 (Ct. App. 2019) (finding no abuse of discretion in admitting DNA evidence even though a "perfect chain of custody was not shown" for the sample used for the initial match because the authenticity of the DNA results were "nevertheless established through the independent testing" of the defendant's DNA profile developed from a sample taken after his arrest).

In sum, we hold the trial court did not err by denying Harrington's motion to suppress DNA evidence because section 17-1-40 does not apply to known blood standards collected by law enforcement for evidentiary purposes. However, even if MCSO did retain Harrington's known blood standard in violation of section 17-1-40, suppression was still unwarranted because law enforcement obtained Harrington's DNA profile from a lawful source independent of this violation by collecting two uncontested known standards.

## II. Expert Testimony

### A. Standard of Review

"The admission of evidence is within the discretion of the trial court and will not be reversed absent an abuse of discretion." *State v. Gaster*, 349 S.C. 545, 557, 564 S.E.2d 87, 93 (2002). "An abuse of discretion occurs when the conclusions of the trial court either lack evidentiary support or are controlled by an error of law." *State v. Pagan*, 369 S.C. 201, 208, 631 S.E.2d 262, 265 (2006). Further, "[t]o warrant reversal based on the wrongful admission of evidence, the complaining party

must prove resulting prejudice." *State v. Byers*, 392 S.C. 438, 444, 710 S.E.2d 55, 58 (2011). Because this was a bench trial, this court's assessment of prejudice "must be viewed from the posture of a bench trial as opposed to a jury trial." *State v. Inman*, 395 S.C. 539, 565, 720 S.E.2d 31, 45 (2011). "It is well-established that it is a near insurmountable burden for a defendant to prove prejudice in the context of a bench trial as a judge is presumed to disregard prejudicial or inadmissible evidence." *Id.*; *see also Cole v. Commonwealth*, 428 S.E.2d 303, 305 (Va. Ct. App. 1993) ("This is not to say that the admission of improper evidence in a bench trial may never result in reversible error. Where the record makes clear that the judge considered such inadmissible evidence in adjudicating the merits of the case, reversal would be appropriate.").

## B. Reliability

Harrington argues the trial court abused its discretion by admitting Worley's testimony because it was unreliable. We disagree.

"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Rule 702, SCRE. "Before admitting expert testimony, trial courts, as the gatekeepers of evidence, must ensure the proffered evidence is beyond the ordinary knowledge of the jury; the witness has the skill, training, education, and experience required of an expert in his field; and the testimony is reliable." *State v. Warner*, 430 S.C. 76, 85, 842 S.E.2d 361, 365 (Ct. App. 2020), *aff'd in part and remanded*, 436 S.C. 395, 872 S.E.2d 638 (2022).

When assessing the reliability of scientific expert testimony, the trial court must consider four factors, as outlined in *State v. Council*:

> (1) the publications and peer review of the technique; (2) prior application of the method to the type of evidence involved in the case; (3) the quality control procedures used to ensure reliability; and (4) the consistency of the method with recognized scientific laws and procedures.

335 S.C. 1, 19, 515 S.E.2d 508, 517 (1999).

Harrington claims Worley's "testimony and conclusions were unreliable and should have been excluded" because she admitted "she did not follow best practices

during her analysis."  Harrington points out that Worley testified she "no longer uses" the method she used in this case to create test impressions[11] and that her laboratory does not follow the protocol outlined in a specific book[12] considered to be the "gold standard" for forensic footwear analysis.  Harrington further notes that Worley admitted her test impressions for this case "weren't the best," that it is "notoriously hard" to differentiate between sizes of Nike Air Force 1s, and that she measured test impressions with a ruler—something she would not normally do—to identify a size difference between the test impressions.

The upshot of Harrington's argument is that Worley's testimony was unreliable because she did not follow the best method available for footwear impression analysis.  This argument mischaracterizes the law.  Experts are not required to employ the best method, only a "reliable method faithfully and reliably applied."  *See Warner*, 430 S.C. at 86–87, 842 S.E.2d at 366 ("The substance of an expert's testimony is reliable if it adheres to the rigors of the method.  As long as the trial court is satisfied the expert's testimony consists of a reliable method faithfully and reliably applied, the gate of admissibility should be opened." (citation omitted)).

Here, Worley testified that she used the ACE-V method for footwear impressions, which was the procedure required by SLED and the one she learned in her training.  The trial court, in exercising its gate-keeping function, confirmed that Worley's method had achieved widespread acceptance in the scientific and law enforcement community, that SLED followed existing guidelines and standards controlling the procedure, and that the technique had been analyzed and tested in scientific publications.  Worley also testified that her process was peer-reviewed by her supervisor and that her analysis and conclusions were reviewed by two qualified examiners.

We hold the trial court considered the *Council* factors and properly determined the expert testimony was sufficiently reliable.  *See Council*, 335 S.C. at 19, 515 S.E.2d at 517 ("In considering the admissibility of scientific evidence[, the trial court] looks at several factors, including: (1) the publications and peer review

---

[11] Worley explained that, in this case, she applied ink to the shoe and had someone who wore a similar size put on the shoe and step directly onto the transparency.  She now has the wearer step onto card stock paper and then reprints the test impression onto the transparency because the transparency can be slippery.  However, she testified both processes are considered acceptable methods.

[12] *See* William J. Bodziak, *Forensic Footwear Evidence* (2d ed. 2016).

of the technique; (2) prior application of the method to the type of evidence involved in the case; (3) the quality control procedures used to ensure reliability; and (4) the consistency of the method with recognized scientific laws and procedures."). Thus, the trial court did not abuse its discretion in admitting Worley's testimony.[13]

## III. Five-Year Sentence

Harrington argues the trial court violated section 16-23-490(A) of the South Carolina Code by sentencing him to five years' imprisonment for possession of a weapon during the commission of a violent crime because he was sentenced to life without parole for murder. The State agrees, and we thus vacate the sentence.

Section 16-23-490(A) states:

> If a person is in possession of a firearm or visibly displays what appears to be a firearm or visibly displays a knife during the commission of a violent crime and is convicted of committing or attempting to commit a violent crime[,] . . . he must be imprisoned five years, in addition to the punishment provided for the principal crime. This five-year sentence does not apply in cases where the death penalty or a life sentence without parole is imposed for the violent crime.

The text unambiguously provides that the mandatory five-year sentence for possession of a weapon during the commission of a violent crime must not be imposed if the defendant has been sentenced to life without parole for the violent crime. *See State v. Palmer*, 415 S.C. 502, 525, 783 S.E.2d 823, 835 (Ct. App. 2016) (vacating the appellant's sentence for possession of a weapon during the commission of a violent crime "because [section 16-23-490(A)] provides the five-year sentence is inapplicable when a court imposes a life without parole sentence"); *State v. Owens*, 346 S.C. 637, 666–67, 552 S.E.2d 745, 760 (2001) (vacating the five-year sentence for possession of a firearm during the commission of a violent crime because the

---

[13] Harrington also argues the trial court erred in admitting the evidence under Rule 403, SCRE, because Worley's conclusions were unreliable and therefore had no probative value. We hold the testimony was reliable and its probative value was not substantially outweighed by the danger of unfair prejudice. *See* Rule 403, SCRE ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . .").

appellant was sentenced to death), *overruled on other grounds by State v. Gentry*, 363 S.C. 93, 610 S.E.2d 494 (2005). Because Harrington was sentenced to life without parole for murder—the violent crime associated with the possession of a weapon charge—the trial court erred in imposing this sentence and we thus vacate it.

## CONCLUSION

Based on the foregoing, the decision of the trial court is

**AFFIRMED IN PART AND VACATED IN PART.**

**KONDUROS and VINSON, JJ., concur.**